Roberto TEFEL, et al., Plaintiffs-Appellees,

v.

Janet RENO, et al., Defendants-Appellants.

No. 98-4616.

United States Court of Appeals,

Eleventh Circuit.

July 14, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 97-CV-805-JLK), James Lawrence King, Judge.

Before CARNES and HULL, Circuit Judges, and HENDERSON, Senior Circuit Judge.[*]

HULL, Circuit Judge:

This class action involves the application of the recently enacted "stoptime" rule for determining eligibility for suspension of deportation. Appellants Janet Reno, Attorney General of the United States; Robert Wallis, Miami District Director of the Immigration and Naturalization Service; the Immigration and Naturalization Service; the United States Department of Justice; and the Board of Immigration Appeals (collectively the "INS") appeal two orders: (1) the district court's order entering a class-wide preliminary injunction prohibiting the enforcement of section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") as amended by the Nicaraguan and Central American Relief Act ("NACARA"), and (2) the district court's order denying the INS' motion to dissolve the preliminary injunction.

Appellees/Plaintiffs ("Plaintiffs") are members of a class of aliens within Georgia, Alabama, and Florida who were placed in deportation proceedings prior to IIRIRA. Plaintiffs challenge the application of IIRIRA § 309(c)(5), which effectively renders Plaintiffs ineligible for "suspension of deportation" under section 244 of the Immigration and Nationality Act ("INA") prior to the repeal of INA § 244 by IIRIRA.

[*]This decision is rendered by a quorum, due to Judge Henderson's death on May 11, 1999. 28 U.S.C. § 46(d).

After review, we vacate the injunction, reverse the denial of the INS' motion to dissolve the injunction, and remand for further proceedings consistent with this opinion.

I.      *The Stop-Time Rule*

Prior to IIRIRA's amendments to the INA, an alien facing deportation could apply for "suspension of deportation."  In order to be eligible for suspension of deportation, an alien was required to establish four factors.  INA §§ 244(a)(1) & (2), 8 U.S.C. §§ 1254(a)(1) & (2) (1991).  One of these factors was that the alien had been "physically present in the United States for a continuous period of not less than" ten years after becoming deportable or seven years after applying for suspension of deportation.  *Id.*[1]  Prior to IIRIRA, the time an alien spent in deportation proceedings counted toward the physical-residence requirement.

Among its many revisions to the INA, IIRIRA repealed the suspension-of-deportation provision of INA § 244 and replaced it with new INA § 240A providing for the "cancellation of removal."  IIRIRA § 304(a).  IIRIRA also enacted the "stop-time" provision for determining an alien's eligibility for suspension of deportation or cancellation of removal.  IIRIRA § 304(a)(3) (enacting INA § 240A(a)).  Under new INA § 240A(a), a permanent resident alien is eligible for cancellation of removal if, among other things, the alien "has resided in the United States continuously for 7 years after having been admitted in any status."  8 U.S.C. § 1229b(a) (Supp.1998).  Similarly, a nonpermanent resident alien is eligible for cancellation of removal if, among other things, the alien "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding" the application for cancellation of removal.  8 U.S.C. § 1229b(b) (Supp.1998).  Under the new "stop-time" provision, however, an alien's period of residence or continuous

---

[1]Under INA § 244(a)(2), the Attorney General could order "suspension of deportation" if:  (1) deportation was based on certain specified grounds, (2) the alien had been "physically present in the United States for a continuous period of not less than ten years" after becoming deportable, (3) in that time was a person of "good moral character", and (4) in the opinion of the Attorney General, deporting the alien would cause "exceptional and extremely unusual hardship" to the alien or to the alien's "spouse, parent, or child" who is a United States citizen.  INA § 244(a)(2), 8 U.S.C. § 1254(a)(2).  Importantly, however, establishing these four factors did not entitle an alien to suspension of deportation.  *Gomez-Gomez v. INS,* 681 F.2d 1347, 1349 (11th Cir.1982).  Instead, granting suspension of deportation remained within the Attorney General's discretion.  *Id.*

2

physical presence in the United States is deemed to end once the alien has been served with a "notice to appear" for removal proceedings or commits a criminal offense described in INA § 244A(d)(1), 8 U.S.C. § 1229b(d)(1) (Supp.1998).[2]

Shortly after the enactment of IIRIRA, the BIA held that the new "stop-time" rule applied to aliens who had applied for suspension of deportation prior to IIRIRA's enactment. *Matter of N-J-B,* Int. Dec. 3309 (BIA 1997).[3] Citing IIRIRA § 309(c)(5), which provides the "Transitional Rule with Regard to Suspension of Deportation", the BIA concluded that the stop-time provision of INA § 240A(d) applied to aliens placed in deportation proceedings before the September 30, 1996 date of IIRIRA's enactment.[4] Under the BIA's application of IIRIRA § 309(c)(5), an alien's continuous period of presence in the United States is deemed

---

[2]Specifically, the "stop-time" provision in INA § 244A(d)(1), 8 U.S.C. § 1229b(d)(1) (Supp.1998) provides that:

> For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 1229(a) of this title or when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or (4) of this title, whichever is earliest.

INA § 244A(d)(1), 8 U.S.C. § 1229b(d)(1) (Supp.1998)

[3]On July 10, 1997, the Attorney General vacated the BIA's decision in *Matter of N-J-B* and certified the case to herself for review under 8 C.F.R. § 3.1(h)(1)(I) (providing that "[t]he Board shall refer to the Attorney General for review of its decision all cases which ... [t]he Attorney General directs the Board to refer to [her]."). Nevertheless, NACARA, enacted in December 1997, clarified that the BIA had correctly interpreted IIRIRA § 309(c)(5).

[4]IIRIRA § 309(c)(5) provides:

> TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence of physical presence) shall apply to notices to appear issued before, on, or after the date of enactment of this Act [i.e. September 30, 1996].

IIRIRA § 309(c)(5).

to end once deportation proceedings are commenced, even if the alien was facing deportation and had applied for suspension of deportation prior to IIRIRA's enactment on September 30, 1996.

II.     *Plaintiffs' Class-Action Complaint*

On March 28, 1997, Plaintiffs filed a class-action complaint in the United States District Court for the Southern District of Florida challenging the BIA's interpretation of the applicability of the stop-time provision. The asserted Plaintiff class consisted of aliens from various countries including Nicaragua, Haiti, Malaysia, and Iran. All of the Plaintiffs had entered the United States more than seven years earlier but were placed in deportation proceedings before they had accumulated seven years of continuous physical presence in the United States.

In their complaint, Plaintiffs included four counts of alleged statutory and constitutional violations arising from the BIA's application of IIRIRA's new stop-time provision to aliens in deportation proceedings before IIRIRA's enactment. First, Plaintiffs claimed that the BIA's interpretation of IIRIRA § 309(c)(5) was arbitrary and capricious in violation of the Administrative Procedures Act. Second, Plaintiffs claimed that as applied to aliens in deportation proceedings prior to IIRIRA, the stop-time provision violated Plaintiffs' due process and equal protection rights. Third, the Plaintiffs from Nicaragua alleged an estoppel claim asserting that the INS induced these Plaintiffs into applying for suspension of deportation and then opposed the Nicaraguan Plaintiffs' applications for suspension. Fourth, Plaintiffs claimed that the alien facing deportation in the *Matter of N-J-B* was wrongfully denied representation during her deportation proceedings.[5]

III.    *Procedural History*

A.      *Initial Proceedings*

On April 17, 1997, Plaintiffs moved for a temporary restraining order or preliminary injunction prohibiting the BIA from deporting any members of the putative Plaintiff class. Plaintiffs also sought to

---

[5]The disposition of Plaintiffs' fourth claim is not clear. However, the district court did not rely on this claim in entering the injunction at issue in this appeal.

enjoin the INS from applying the stop-time rule to any aliens in deportation proceedings prior to enactment of IIRIRA.

On May 20, 1997, the district court issued an order addressing a number of preliminary issues. First, the court denied the INS' motion to dismiss for lack of jurisdiction. Relying on *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984), *aff'd on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), and *Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir. Unit B 1982), the district court concluded that it could exercise jurisdiction over Plaintiffs' claims because these claims were not covered by the provision of former INA § 106 that granted the court of appeals exclusive jurisdiction over challenges to deportation proceedings.

In addition to denying the INS' motion to dismiss for lack of jurisdiction, the court granted "provisional class certification" of Plaintiffs' class and appointed lead counsel. The court found that the requirements for class certification under Rule 23(a) were satisfied and that Mr. Kurzban, as lead counsel, was particularly qualified to represent the class.

Although Plaintiffs had moved for "provisional" class certification, the district court apparently granted Plaintiffs final class-action status. The court's May 20, 1997 order did not limit the certification to "provisional" certification, and the record does not indicate that the district court subsequently granted class certification. Indeed, in its subsequent order entering the preliminary injunction, the district court indicated that it had granted Plaintiffs class-action status and identified the class as follows:

> All individuals within the states of Georgia, Alabama and Florida who have been or will be denied suspension of deportation as a result of the BIA's decision to apply the transitional rule of § 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) retroactively to persons who have sought or are seeking suspension of deportation.

Finally, in its May 20, 1997 order, the district court granted Plaintiffs' motion for a temporary restraining order enjoining the INS from, *inter alia,* deporting any members of the Plaintiff class. The district court first determined that Plaintiffs had established a substantial likelihood of success on their claim that the BIA had misinterpreted IIRIRA § 309(c)(5)(a) in *Matter of N-J-B.* The district court held that IIRIRA §

5

309(c)(5)(a) provided that the stop-time provision in INA § 240A(d) applied only to aliens who applied for suspension of deportation and were placed in removal proceedings after IIRIRA's general effective date of April 1, 1997. The court also found a likelihood of success on Plaintiffs' constitutional claims and the estoppel claims asserted by the class members from Nicaragua.

Furthermore, the district court found that Plaintiffs had established the other factors required for preliminary injunctive relief—(a) irreparable harm from class members being deported and in many cases separated from their families, (b) balance of the harms in favor of Plaintiffs since the only harm to the INS would be having to process Plaintiffs' applications for suspension of deportation, and (c) the public interest in avoiding the potentially wrongful deportation of a great many productive residents in local communities.

Accordingly, the district court broadly ordered that the INS was "restrained ... from deporting the Plaintiffs and class members pending further order of this Court and from enforcing *Matter of N-J-B* and otherwise pretermitting applications for suspension of deportation based on *Matter of N-J-B* or its rationale." According to the INS, the court's injunction effectively prevented the INS from using the stop-time provision as a basis for denying an alien's application for suspension of deportation if the alien had been placed in deportation proceedings prior to IIRIRA's general effective date of April 1, 1997.

B.      *Evidentiary Hearing and Preliminary-Injunction Order*

The district court's May 20, 1997 order set a preliminary-injunction hearing for May 27, 1997. The parties presented some evidence and testimony on May 27 but were unable to present a full case. Accordingly, the district court extended the temporary restraining order and referred the case to a magistrate judge for a further evidentiary hearing. Between May 27 and June 12, 1997, the parties conducted discovery and, on several days during this period, appeared before the magistrate judge for further presentation of evidence.

After the proceedings before the magistrate judge on the preliminary-injunction motion, the magistrate judge issued a recommendation that Plaintiffs had established three of the four elements necessary

6

for a preliminary injunction. The magistrate judge concluded that Plaintiffs had established irreparable harm, and that the balance of the harms and the public interest favored a preliminary injunction. However, the magistrate judge concluded that only the district court could make a finding on whether the Plaintiffs had established a likelihood of success on the merits of their claims.

In an extensive order dated June 24, 1997, the district court granted Plaintiffs' motion for a preliminary injunction. First, the Court adopted the magistrate judge's finding that Plaintiffs had established that the irreparable-harm, balance-of-the-harm, and public-interest factors favored the issuance of an injunction.

The court also expounded on its conclusion that Plaintiffs had established a likelihood of success on their claims that the BIA had erroneously interpreted IIRIRA § 306(c)(5), that the stop-time rule was unconstitutional as applied to Plaintiffs, and that the INS was estopped from applying the stop-time rule. In finding a substantial likelihood of success on the merits of the due-process and the estoppel claims, the district court relied heavily on the circumstances surrounding the Nicaraguan members of the class. According to the district court, the INS induced the Nicaraguan class members into applying for suspension of deportation but then moved to pretermit these applications under the stop-time rule. The court reasoned that the INS had caused the Nicaraguan class members to incur substantial filing fees, legal fees, and an expectation that their applications for suspension would be granted, all of which gave rise to a "property or liberty interest" in a hearing on their applications for suspension. According to the district court, the Constitution prohibited the deprivation of this "property or liberty interest" without the due process of law.

In addition, the district court found that the application of the stop-time rule was "irrational" in violation of equal protection.[6] The court found that aliens who "came forward" to be placed in deportation proceedings before reaching the seven-year physical-presence requirement and who "won their suspension case[s]" were deemed ineligible for suspension. Conversely, according to the district court, aliens who

[6]Of course, by referring to equal protection, the district court was relying on the equal protection component of the Fifth Amendment's Due Process Clause.

7

"evaded the INS successfully for seven years" could become eligible for suspension. The district court concluded that "any scheme which grants relief to person who did not come forward and denies relief to persons who did come forward is irrational and in violation of equal protection."

Likewise, the district court noted that the stop-time rule precludes an alien from accumulating time toward the physical-presence requirement as soon as the INS issues an order to show cause even if the alien's deportation proceedings do not begin for several years. Thus, the court concluded that a system that "turns on whether someone is served with a charging document" was irrational in violation of equal protection.[7]

Based on these conclusions, the district court entered an injunction that prohibited the same actions prohibited by the court's earlier restraining order. Specifically, the district court ordered that:

> ORDERED, ADJUDGED and DECREED that the Defendants, Janet Reno, Attorney General of the United States, Robert Wallis, District Director, Immigration and Naturalization Service, Department of Justice, and Board of Immigration Appeals, and their agents, employees, lawyers, and persons acting under the[ir] direction and control, be and they are hereby, preliminarily enjoined from (1) deporting any member of the Plaintiff class, and (2) enforcing *Matter of N-J-B* or otherwise pretermitting applications for suspension of deportation based on the defendants' policy as expressed in said *Matter of N-J-B*.

IV.    *Developments Following Entry of Preliminary Injunction*

A.    *Enactment of NACARA*

Subsequent to the entry of the preliminary injunction, Congress enacted, and the President signed the Nicaraguan and Central American Relief Act, Pub.L. 105-100, 111 Stat. 2160 (1997) ("NACARA"). On December 2, 1997, the President also signed into law technical amendments to NACARA. Public L. No. 105-139, 111 Stat. 2644 (1997).

---

[7]It is important to note that although the district court couched its holding in terms of the application of the stop-time rule to aliens whose deportation proceedings began prior to IIRIRA, the court's reasoning suggests that it found the stop-time rule itself, regardless of its application to pending proceedings, to be violative of due process and equal protection. For example, the court reasoned that "any analysis which turns on whether someone is served with a charging document, even if the actual hearing does not occur for many years thereafter, is irrational and violates equal protection." Since the stop-time rule as applied in the context of cancellation of removal under the post-IIRIRA INA continues to be triggered by the service of a notice to appear, the district court's reasoning would also apply to the application of the stop-time rule to post-IIRIRA deportation proceedings.

8

A number of NACARA's amendments are relevant to the instant appeal. First, NACARA § 203(a)(1) amends IIRIRA § 309(c)(5) and changes the language "notices to appear" to "orders to show cause." In addition, NACARA § 203(f) specifies that the amendments made by NACARA § 203 are effective as if originally enacted with IIRIRA. Thus, NACARA, by expressly referring to "orders to show cause," which initiated deportation proceedings prior to IIRIRA, resolves any potential linguistic ambiguity in IIRIRA § 309(a)(c) with respect to the applicability of the stop-time provision of INA § 240A(d). With this amendment, NACARA clarifies that the stop-time provision applies to aliens who were facing deportation and/or had applied for suspension of deportation before IIRIRA's enactment, because it precludes any argument that the reference to "notices to appear" suggested that Congress intended the stop-time rule to apply only to post-IIRIRA removal proceedings, which are initiated with "notices to appear."

In addition, NACARA includes several provisions that mitigate the effects of applying the stop-time rule to aliens who were in deportation proceedings before IIRIRA. Under NACARA § 203(a), certain aliens from El Salvador, Guatemala, and Eastern Europe can apply for suspension of deportation without being subject to the stop-time provision. Moreover, NACARA allows qualified aliens from Nicaragua and Cuba to bypass the suspension-of-deportation process altogether and apply for an adjustment of their status to aliens admitted for permanent residence. NACARA §§ 202(a)(1) & (b)(1).

B.      *INS' Motion to Dissolve the Preliminary Injunction*

On December 22, 1997, prompted by NACARA's amendments to IIRIRA, the INS moved to dissolve the district court's preliminary injunction and moved for summary judgment on all of Plaintiffs' claims. First, the INS argued that because of NACARA, Plaintiffs' claims were moot with respect to all class members from Nicaragua, Cuba, Guatemala, El Salvador, and Eastern Europe who qualified for the relief from the stop-time provision enacted by NACARA. Second, the INS argued that the district court's prior determination that the Plaintiffs had established a likelihood of establishing that the BIA had incorrectly interpreted IIRIRA §

9

306(c)(5) was no longer valid in light of NACARA § 203(a), which clarified that Congress intended the stop-time rule to apply to aliens in deportation proceedings before IIRIRA's enactment.

On February 10, 1988, the district court denied the INS' motion to dissolve the injunction and the INS' motion for summary judgment. Although the court agreed that Plaintiffs could no longer demonstrate a likelihood of success on their claim that the BIA had incorrectly interpreted IIRIRA § 305(c)(5), the court reaffirmed its previous conclusion that the Plaintiffs had established a likelihood of success on the merits of their constitutional claims. In addition, the court acknowledged that NACARA provided aliens from Nicaragua, Cuba, Guatemala, El Salvador, and Eastern Europe the opportunity to apply for the type of relief sought by certain members of the Plaintiff class. However, the court held that not all of the Plaintiffs from these countries necessarily would be eligible for the relief under NACARA. The court noted that certain class members might not qualify for the exception to the stop-time provision and that other class members might not be eligible to apply for a change of status. Accordingly, the court held that it could not yet determine which claims were mooted by NACARA. Specifically, the district court noted that "[a]lthough NACARA makes it clear that certain class members will receive the relief they seek, it is not clear at this time who those class members are."

For the same reasons supporting its decision not to dissolve the preliminary injunction, the court also denied the INS' motion for summary judgment.

This appeal followed.

C.    *Developments During this Appeal*

Since this case has been on appeal, many of the named Plaintiffs have received various relief under NACARA. Many of them have become lawful permanent residents. Other Plaintiffs are awaiting hearings, which have been scheduled, on the adjustment of their status to legal permanent residence. Still other Plaintiffs have closed, with the INS' consent, their administrative proceedings in order to file for adjustment

10

of status under NACARA. Finally, the INS has dropped its appeals of several immigration-judge decisions granting suspension to several named Plaintiffs.

These developments, along with the developments that prompted the INS to move to dissolve the injunction, have seriously altered the legal and factual situations of all but two of the named Plaintiffs. Although these developments might not have mooted, as argued by the INS, all of the claims in this appeal, these developments are highly relevant to the reasoning used by the district court in finding that Plaintiffs had established a likelihood of success on the merits of their due process and estoppel claims. In addition, while the claims of two named Plaintiffs remain ripe for adjudication, these developments raise serious questions regarding whether class-action status remains appropriate for this case and if so, whether the remaining Plaintiffs are proper class representatives.

The original complaint in this case included thirty-nine named individual Plaintiffs and the family members of those Plaintiffs. Of these original thirty-nine Plaintiffs and their families, thirty-five are Nicaraguan. Of those thirty-five Plaintiffs, thirty-three have received, or are eligible for, relief that places them in significantly different positions than when the district court entered the injunction in this case. Of the remaining two named Nicaraguan Plaintiffs, the immigration status of one Plaintiff is unclear and the immigration status of the other one remains pending before the Attorney General. Of the four remaining non-Nicaraguan Plaintiffs, the claim of one Plaintiff is almost certainly moot, and another may be eligible for relief from deportation other than suspension. Therefore, only two of the original thirty-nine named Plaintiffs/Plaintiff families face the same situation that prompted the district court to find a constitutional violation and enjoin the application of the stop-time rule.

More specifically, of the thirty-five named Nicaraguan Plaintiffs, twenty have become lawful permanent residents under NACARA: (1) Roberto Tefel, (2) Leonel Martinez, (3) Lorena Garcia (4) Ana Borge, (5) Ignacio Herrera, (6) Nydia Mercado, (7) Liliam Portillo, (8) Sebastian Murillo, (9) Jesus Chow, (10) Gloria Guerrero, (11) Virginia Rodriguez, (12) Leonte Martinez, (13) Zulema Balladares, (14) Franklin

11

Siu, (15) Justina Jiron, (16) Armando Largaespada, (17) Herenia Matute, (18) Enrique Sequeira, (19) Dudley Rocha-Petterson, (20) Ernesto Torres Sandoval.[8] Similarly, two of the original Nicaraguan Plaintiffs became lawful permanent residents prior to NACARA—(21) Carlos Morales and (22) Lucrecia Raudes.

Of the remaining thirteen named Plaintiffs, the following three are awaiting a hearing on the adjustment of their status to that of lawful permanent residents: (23) Douglas Membrano-Murillo and Damarys Contrera; (24) Juan and Ricardo Bermudez; and (25) Boanerges Pao.

Of the remaining ten named Plaintiffs, the following four have opted, with the INS' consent, to close their administrative proceedings so that they can file for adjustment of status under NACARA: (26) Manuel Mantilla, (27) Roberto Barberena, (28) Carlos Rivas, and (29) Ricardo Fonseca. Likewise, one Plaintiff, (30) Juan Gonzaga Baez, was granted suspension, the INS appealed, and Baez subsequently filed a motion to reopen so that he could apply for adjustment of status under NACARA.

In the following two cases, the aliens had been granted suspension of deportation by an immigration judge, and the INS has withdrawn its appeal of the immigration judge's decision: (32) Jaime Enriquez and (33) Freddy Quintero. Finally, one Plaintiff (34) Wilibur Baez has withdrawn as a named Plaintiff and a member of the class.

The status of one named Plaintiff, Roberto Rivera, is unclear, and one Plaintiff, Norma J. Baldizon, is awaiting the decision of the Attorney General who certified his case for her own decision.

Of the four non-Nicaraguan named Plaintiffs, the claim of one, Roberto Amaya, has been mooted and one, Alexandra Charles, may be eligible for relief under the Haitian Refugee Fairness Act, which also was signed into law while this case was on appeal.

Therefore, only two named Plaintiffs are currently facing the same legal and factual situation that they faced when the district court entered its injunction in this case. Khadijeh Aidenezhad is an alien from Iran who has lived in the United States since 1985. The immigration judge granted Ms. Aidenezhad

_____

[8]In addition, German A. Reyes, who was joined as a Plaintiff after the initial complaint had been filed, has also become a permanent resident under NACARA.

12

suspension of deportation, and the INS appealed the immigration judge's decision arguing that Ms. Aidenezad could not satisfy the continuous physical-presence requirement under the stop-time rule. It is not clear from Plaintiffs' complaint when deportation proceedings commenced against Ms. Aidenzhad or when the immigration judge granted Ms. Aidenzhad suspension. Subalecthumy Vengadasalm is an alien from Malaysia. On November 8, 1996, the immigration judge granted her suspension of deportation, and the INS appealed this decision based upon the stop-time rule.

Because there are Plaintiffs whose claims remain ripe for adjudication, we proceed to reach the merits of Plaintiffs' preliminary injunction motion granted by the district court. However, as detailed later in this opinion, these developments on appeal require the district court on remand to revisit certain aspects of the class-action status of this case.

V.      *Standard of Review*

This Court reviews *de novo* issues of subject matter jurisdiction. *Triggs v. John Crump Toyota, Inc.,* 154 F.3d 1284, 1287 (11th Cir.1998).

A party seeking a preliminary injunction must establish the following four factors: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury, (3) that its own injury would outweigh the injury to the nonmovant, and (4) that the injunction would not disserve the public interest. *Haitian Refugee Ctr., Inc. v. Baker,* 949 F.2d 1109, 1110 (11th Cir.1991) (per curiam). A mixed standard of review applies to review of the granting or denying of a preliminary injunction. *Bah v. City of Atlanta,* 103 F.3d 964, 966 (11th Cir.1997). A district court's decision to grant a preliminary injunction and the denial of a motion to dissolve a preliminary injunction are reviewed for an abuse of discretion. *Id.; Collum v. Edwards,* 578 F.2d 110, 112 (5th Cir.1978). However, questions of law supporting the preliminary injunction are reviewed *de novo. Id.*

VI.     *Jurisdiction*

13

As an initial matter, we must determine whether the district court had jurisdiction over Plaintiffs' claims. The parties have briefed extensively numerous jurisdictional issues focusing particularly on whether IIRIRA's amendments to the INA's scheme for the judicial review of immigration matters altered the district court's jurisdiction over this case. We hold that this case is governed by IIRIRA's transitional rules, and therefore, the district court properly exercised jurisdiction over Plaintiffs' claims.

Under the INA before IIRIRA's amendments, the Supreme Court and this Court recognized that not all challenges to INS actions were committed exclusively to the jurisdiction of the court of appeals. *McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984), *aff'd on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *Haitian Refugee Ctr. v. Smith,* 676 F.2d 1023 (5th Cir. Unit B 1982). Because Plaintiffs' claims are within the narrow category of claims that the pre-IIRIRA INA did not exclusively commit to the jurisdiction of the court of appeals, the district court did not err in resting its jurisdiction on *McNary, Jean* and *Smith.* Likewise, because IIRIRA's transitional provisions, rather than IIRIRA's complete amendments to the INA, govern jurisdiction over Plaintiffs' claims, IIRIRA did not deprive the district court of jurisdiction.[9]

In *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033 (5th Cir. Unit B 1982), this Court held that the exclusive judicial-review procedures under former INA § 106(a) did not apply to claims alleging "a program, pattern or scheme by immigration officials to violate the constitutional rights of aliens." In reaching this conclusion, this Court first noted that INA § 106(a) vested exclusive jurisdiction in the court of appeals to review " 'all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under section 1252(b) [deportation hearings]....' " *Id.* at 1032 (quoting INA § 106(a), 8 U.S.C. § 1105a(a) (1982)). We reasoned that the INA's judicial-review procedures gave "sole jurisdiction" to the court of appeals over "alleged procedural irregularities" but only "*to the extent these*

---

[9]In concluding that the district court had jurisdiction over Plaintiffs' claims, this Court does not affirm or endorse the findings or reasoning of the district court in justifying its exercise of jurisdiction. Instead, we base our conclusion on the reasoning set out in this opinion.

14

*irregularities may provide a basis for reversing an individual deportation order ...."* *Id.* at 1033 (emphasis

in original). Thus, this Court in *Smith* recognized a distinction between (1) the court of appeals' jurisdiction

over an individual alien's deportation proceedings and final deportation order and (2) a district court's

jurisdiction over widespread allegations of constitutional violations by immigration officials:

> The distinction we draw is one between the authority of a court of appeals to pass upon the merits
> of an individual deportation order and any action in the deportation proceeding to the extent it may
> affect the merits determination, on the one hand, and on the other, the authority of a district court to
> wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional
> violations is alleged.

*Smith,* 676 F.2d at 1033 (finding cognizable in district-court claims challenging the constitutional adequacy

of the INS' procedures for administering asylum applications).

Similarly, in *Jean v. Nelson,* 727 F.2d 957, 980 (11th Cir.1984), this Court concluded that former

INA § 106(b), 8 U.S.C. § 1105a(b)(1984), did not preclude district-court jurisdiction over "widespread abuses

by immigration officials." We began by noting that INA § 106(b), 8 U.S.C. § 1105a(b)(1984) provided that

" 'any alien against whom a *final* order of exclusion has been made heretofore or hereafter ... may obtain

judicial review of such order by habeas corpus proceedings *and not otherwise.*' " *Id.* at 980 (emphasis in

original) (quoting INA § 106(b)), 8 U.S.C. § 1105a(b)(1984). Essentially following the holding in *Smith,* this

Court concluded that this limitation did not preclude the district court's jurisdiction over allegations that the

INS wrongfully failed to give the plaintiffs notice of asylum. *Id.*

To ensure that the exceptions from *Smith* and *Jean* did not swallow the general rule of the exclusivity

of the INA's judicial-review procedures, in both cases, this Court carefully noted the limited nature of these

exceptions to the exclusive-review provisions under the pre-IIRIRA INA. In *Smith,* we stated that "[o]ur

holding is not to be construed as permitting a constitutional challenge in the district court based on a

procedural ruling in a deportation proceeding with which an alien is dissatisfied." 676 F.2d at 1033. We

further noted that such an attempt to assert district-court jurisdiction would constitute an "end-run around the

administrative process" and would be inconsistent with Congress' intent in enacting the INA's judicial-review

15

scheme. *Id.* Likewise, in *Jean,* we reiterated the limited nature of our holding. 727 F.2d at 980. "We stress that our holding is a narrow one that should not be construed to permit judicial review of run-of-the-mill interlocutory procedural rulings by an immigration judge with which an alien happens to disagree." *Id.*

After this Court decided *Smith* and *Jean,* the Supreme Court employed similar reasoning in *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). At issue in *McNary* were the judicial-review procedures governing INS decisions made regarding a special amnesty program for agricultural workers. These judicial-review provisions provided that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection" and that "[t]here shall be judicial review of such denial only in the judicial review of an order of exclusion or deportation under section 1105a of this title [INA § 106 (providing for judicial review in the court of appeals) ]." *McNary,* 498 U.S. at 486 n. 6, 111 S.Ct. at 893 n. 6 (quoting INA §§ 210(e)(1) & (3)(A)). Relying heavily on the specific wording of these judicial-review provisions, the Court reasoned that the reference to a singular "application for adjustment" in INA § 210(e)(1) and a singular "judicial review of such denial" in INA § 210(e)(3)(A) indicated that these provisions governed jurisdiction over singular, individual amnesty applications and not "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.; see also Reno v. Catholic Soc. Serv., Inc.,* 509 U.S. 43, 55, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (holding that provisions "virtually identical" to the provisions at issue in *McNary* did not preclude district-court jurisdiction over challenges to a regulation implementing an INS legalization program).

In this appeal, Plaintiffs assert the type of class-wide challenges to INS practices that fall outside the pre-IIRIRA judicial-review scheme. Plaintiffs do not challenge the specific result in any single case and do not argue that any of the individual Plaintiffs would receive suspension of deportation if their applications received full consideration. Instead, Plaintiffs allege, and the district court found, that the application of the stop-time provision to the members of the Plaintiff class violated Plaintiffs' constitutional rights. Thus,

16

Plaintiffs assert "a program, pattern or scheme by immigration officials to violate the constitutional rights of aliens" that is similar to the due-process claims in *Smith* and *Jean.* Accordingly, the district court did not err in its conclusion that the pre-IIRIRA INA did not require that Plaintiffs' claims be asserted through a petition for review in the court of appeals.[10]

The INS argues that INA § 242(g), which applies in transitional cases, precludes district-court jurisdiction over Plaintiffs' claims.[11]  The INS acknowledges the Supreme Court's decision in *Reno v. American-Arab Anti-Discrimination Committee,* --- U.S. ----, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999), but nonetheless claims that INA § 242(g) precludes jurisdiction over Plaintiffs' claims.

Despite the INS' arguments, INA § 242(g) does not apply to Plaintiffs' claims.  The Supreme Court in *American-Arab* narrowly construed INA § 242(g) as applying only to the three discrete discretionary actions described in INA § 242(g)—the "decision or action" to (1) "commence proceedings," (2) "adjudicate cases," or (3) "execute removal orders." 119 S.Ct. at 943.  According to the Court, Congress had good reason to focus a particular statutory provision limiting judicial review of these types of claims.  *Id.* at 943-44 ("There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of 'commenc[ing] proceedings, adjudicat[ing] cases, [and]

_____

[10]At this point, we reemphasize that Plaintiffs and the INS agree that this case is governed by IIRIRA's transitional rules.  Thus, most of IIRIRA's substantial revisions to the INA's judicial-review scheme do not apply to this case and do not govern jurisdiction over Plaintiffs' claims.  Although contending the permanent rule in INA § 242(g) applies, the INS concedes that nothing in IIRIRA's transitional provisions altered the district court's jurisdiction over Plaintiff's claims.  Moreover, as defined by the district court, the Plaintiff class also includes aliens who were subject to final deportation orders prior to IIRIRA.  The deportation proceedings of these Plaintiffs are governed by INA § 106 without the transitional rule amendments.

[11]INA § 242(g) provides that:

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g) (Supp.1998).

17

execut[ing] removal orders'—which represent the initiation or prosecution of various stages in the deportation process.") Plaintiffs' challenges to the application of the stop-time rule to pending applications for suspension involve constitutional challenges to legislation specifically mandating such an application of the stop-time rule. Plaintiffs' claims do not challenge the Attorney General's exercise of her discretion to commence proceedings, adjudicate cases, or execute removal orders. Thus, INA § 242(g) does not alter the jurisdiction, recognized by this Court in *Smith* and *Jean,* over class-wide allegations of constitutional violations by the INS.

Having determined that the district court properly exercised jurisdiction over Plaintiffs' claims, we now turn to whether the district court properly entered the preliminary injunction.

## VII.    *Constitutional Claims*

As discussed above, the district court found that Plaintiffs were likely to succeed on two constitutional claims. First, the district court concluded that the stop-time rule was irrational, and in violation of the equal protection component of the due process clause, because the stop-time rule rewarded aliens who evaded service of a notice to appear and penalized aliens who appeared in order to contest their deportations. Second, the district court held that the application of the stop-time rule to pending applications for suspension of deportation deprived Plaintiffs' of a "liberty or property" interest that the government created by enticing the Plaintiffs' to apply for suspension. We conclude that the district court erred in finding that Plaintiffs had established a substantial likelihood of success on the merits of their constitutional claims.

## A.    *Equal-Protection Claim*

The rational-basis standard applies to Plaintiffs' equal-protection claim. *Rodriguez v. United States,* 169 F.3d 1342 (11th Cir.1999) (citing *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), for the proposition that "statutes which discriminate within the class of aliens comport with the Due Process Clause of the Fifth Amendment (and the equal protection principles it incorporates) so long as they satisfy rational basis scrutiny."). Under rational-basis scrutiny, a statute is "accorded a strong presumption of

18

validity" and will be upheld if "any reasonably conceivable state of facts" could demonstrate that the statute is rationally related to a legitimate government purpose. *Heller v. Doe,* 509 U.S. 312, 319-320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *Rodriguez,* 169 F.3d at 1350. "A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Heller,* 509 U.S. at 321, 113 S.Ct. 2637.

In this appeal, the stop-time rule of INA § 244A(d)(1), and IIRIRA § 309(c)(5)'s application of the stop-time rule to aliens in deportation proceedings prior to IIRIRA's enactment, are rationally related to legitimate government purposes. Congress intended the stop-time rule to eliminate the incentive to prolong deportation proceedings in order to become eligible for suspension. *See, e.g.,* H.R.Rep. No. 104-879 (1997) ("Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued.") Certainly, removing the incentive for delay in the deportation process is a legitimate government objective. The stop-time rule clearly furthers this purpose by stopping the accrual of time toward the physical-residence requirement at the commencement of removal proceedings. Applying the stop-time rule immediately (i.e. to aliens already in deportation proceedings) further promotes this objective by applying the rule to a larger number of aliens and removing their incentive to prolong the proceedings.

Moreover, despite the district court's reasoning, Congress rationally chose the service of a "notice to appear" to delineate the beginning of removal proceedings. Some point in the process had to be chosen, and the service of such a notice is as good a point as any because it is when the alien is first informed that he or she is facing removal from the United States. The fact that some aliens might successfully evade service of the notice to appear does not diminish the rationality of the stop-time rule. In this sense, the stop-time rule is no more irrational than Rule 4(m) of the Federal Rules of Civil Procedure, which by allowing the dismissal of a complaint when service is not perfected within 120 days, also "rewards" a person who can successfully evade service.

19

*B.*     *Procedural-Due-Process Claim*

The procedural component of the Fifth Amendment's Due Process Clause protects against the deprivation of life, liberty, or property without the "due process of law." U.S. Const. amd. V. The necessary first step in evaluating any proceduraldue-process claim is determining whether a constitutionally protected interest has been implicated. *Economic Dev. Corp. v. Stierheim,* 782 F.2d 952, 954-55 (11th Cir.1986) ("In assessing a claim based on an alleged denial of procedural due process a court must first decide whether the complaining party has been deprived of a constitutionally protected liberty or property interest. Absent such a deprivation, there can be no denial of due process."); *Smith,* 676 F.2d at 1037 ("Procedural due process is not itself an independent right, but merely the condition precedent to the deprivation of a life, liberty, or property interest. We must therefore identify a constitutionally protectable interest which triggers the safeguards of the due process clause. In short, we must determine whether the individual interest threatened by the administrative action in this case 'is one within the contemplation of the "(life), liberty or property" language of the Fifth Amendment.' ") (citations omitted).

The district court found that the INS' actions gave rise to a protectable "liberty or property interest." It noted the various actions taken by the INS to encourage aliens, particularly Nicaraguan aliens, to apply for suspension of deportation. For example, the INS adopted a policy of not opposing motions to reopen deportation proceedings filed by Nicaraguan aliens, and the INS publicized to the Hispanic community the INS' policy of giving Nicaraguan aliens work authorization upon the filing of a motion to reopen and an application for suspension. The district court further noted that when the aliens applied for suspension, they incurred substantial application and attorneys' fees. According to the district court, the INS' actions "without question created an expectation in the Nicaraguan community" that Nicaraguan aliens would be considered for suspension of deportation and that gave rise to a "liberty or property interest in the right to a hearing on their claims for suspension of deportation."

However, expectation does not equate with liberty or property, and a constitutionally protected interest cannot arise from relief that the executive exercises unfettered discretion to award. *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981). In *Dumschat,* the Supreme Court held that a state inmate does not enjoy a constitutionally protected liberty interest in having his or her sentence commuted, even where the state "consistently" commuted the sentences of inmates in "most" cases. *Dumschat,* 452 U.S. at 464-65, 101 S.Ct. 2460. The Court reasoned that "a constitutional entitlement cannot 'be created—as if by estoppel—merely because a wholly and expressly discretionary state privilege has been granted generously in the past.' " *Id.* (quoting *Leis v. Flynt,* 439 U.S. 438, 444 n. 5, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979)). Instead, according to the Court, "[i]n terms of the Due Process Clause, a ... felon's expectation that a lawfully imposed sentence will be commuted or that he will be pardoned is no more substantial than an inmate's expectation, for example, that he will not be transferred to another prison; it is simply a unilateral hope." *Dumschat,* 452 U.S. at 465, 101 S.Ct. 2460.

More specifically, this Court has held that the failure to receive discretionary relief in the immigration context does not deprive an alien of a constitutionally protected liberty interest. *Garcia-Mir v. Meese,* 788 F.2d 1446 (11th Cir.1986). In *Garcia-Mir,* a group of Cuban aliens claimed a liberty interest in hearings to determine whether they should be "paroled" into the United States pending the completion of their immigration proceedings. *Id.* at 1450-51. The aliens noted that the President had issued an "open arms" invitation to Cuban aliens and that Congress had created a special parole category for Cuban and Haitian aliens. *Id.* According to the aliens in *Garcia-Mir,* these actions limited the INS' discretion in making parole determinations and thereby created a constitutionally protected liberty interest. *Id.* This Court acknowledged that the Cuban aliens had been "treated more generously than is normally the case with excludable aliens." *Id.* Nevertheless, we concluded that prior generosity in awarding " 'wholly and expressly discretionary relief' .... does not prove the existence of constitutional entitlement." *Id.* at 1451 (quoting *Dumschat,* 452 U.S. at 465, 101 S.Ct. 2460). Instead, we held that the proper inquiry was whether statutes or regulations limited

21

official discretion in making parole determinations. *Id.* at 1452. Noting that the Executive's discretion in paroling aliens remained free of " 'substantive limitations on official discretion' ", we concluded that the aliens lacked a liberty interest in being paroled. *Garcia-Mir,* 788 F.2d at 1452 (quoting *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)); *see also Rodriguez v. Reno,* --- F.3d ----, Nos. 98-4426 & 98-5878(11th Cir. June 22, 1999) (holding that an ineffective-assistance-of-counsel claim cannot arise from an alien's failure to receive suspension because of the Attorney General's unfettered discretion in granting or denying suspension).

Moreover, *Garcia-Mir* also illustrates that awarding and then revoking discretionary relief does not offend due process. In *Garcia-Mir,* the INS had paroled certain Cuban aliens into the United States but had subsequently revoked their parole. Rejecting the constitutional claims of these Cubans, we observed that absent rules constraining official discretion "one merely has an expectancy reinforced by a system capable of granting or withholding that liberty." 788 F.2d at 1453. Thus, this Court concluded that this group of aliens did not suffer a constitutional violation by receiving and then losing parole without any process. *Id.*

In this appeal, Plaintiffs' procedural-due-process claims are similar to the claims rejected in *Garcia-Mir.* In *Garcia-Mir,* the aliens sought discretionary parole while awaiting further proceedings, and in this case, Plaintiffs seek to apply for discretionary suspension of deportation. In both cases, the federal government had taken actions that created an expectancy that the aliens would receive the relief requested. In *Garcia-Mir,* Congress created a special parole category for Cubans, and in this appeal, the INS had initiated the various aspects of its program to encourage Nicaraguan aliens to apply for suspension.

Therefore, for the same reasons that the aliens in *Garcia-Mir* could not establish a due-process claim, Plaintiffs in this appeal have not established a likelihood of success on the merits of their due-process claim. In *Garcia-Mir,* relying on *Dumschat,* this Court determined that the Executive's complete discretion to make parole decisions was fatal to the Cuban aliens' due process claim. Similarly, the Attorney General possesses broad discretion in awarding suspension of deportation. *See, e.g. INS v. Yueh-Shaio Yang,* 519 U.S. 26, 29,

22

117 S.Ct. 350, 136 L.Ed.2d 288 (1996) (noting the Attorney General's "unfettered discretion" to award suspension of deportation and observing the parallels between suspension and an executive pardon); *Jay v. Boyd,* 351 U.S. 345, 354, 76 S.Ct. 919, 100 L.Ed. 1242 (1956) (noting that suspension of deportation is an "act of grace" like the "probation or suspension of criminal sentence"). Indeed, Plaintiffs have not even attempted to argue that the Attorney General's discretion to grant or deny suspension of deportation is limited by statute or regulation. Thus, because suspension remains a purely discretionary "act of grace" and Plaintiffs have not identified any limits on the Attorney General's discretion to grant or deny applications for suspension of deportation, they do not enjoy any "liberty or property" interest attendant to their applications for suspension.

Plaintiffs attempt to distinguish the reasoning and holding in *Garcia-Mir* by arguing that their constitutional injury stems, not from being denied suspension of deportation, but from being rendered ineligible to be considered for suspension. Plaintiffs' argument draws a distinction without a constitutional difference. Where no deprivation of a liberty or property interest has occurred, no violation of procedural due process has occurred. *Smith,* 676 F.2d at 1037. No constitutionally protected interest arises from the INS' actions in granting or denying applications for suspension because the Attorney General exercises "unfettered" discretion over applications for suspension. Therefore, regardless of the ultimate disposition of an application for suspension of deportation, Plaintiffs do not possess a constitutionally protected interest in their expectancy of receiving suspension. Thus, just as Plaintiffs enjoy no "liberty or property" interest in their expectancy of receiving suspension of deportation, they enjoy no "liberty or property" interest in being eligible to be considered for suspension. Accordingly, being ineligible for suspension does not deprive Plaintiffs of a constitutionally protected interest any more than having their applications for suspension denied.

Plaintiffs also argue that the stop-time rule violates the general presumption against retroactive statutory provisions recognized in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d

23

229 (1994). This argument is without merit for two reasons. First, applying the stop-time rule to deportation proceedings pending prior to IIRIRA is not a retroactive application of a statute. *See Landgraf,* 511 U.S. at 269, 114 S.Ct. 1483 ("A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law.") (citations omitted). As clarified by NACARA § 203(a)(1), the stop-time rule applies to applications for suspension that were pending in the administrative process when IIRIRA was enacted. Applying the stop-time rule to pending administrative cases does not overturn final BIA decisions affirming an immigration judge's decision to grant suspension of deportation. Thus, applying the rule to pending administrative proceedings merely "upsets expectations based in prior law" and does not "impair *rights* a party possessed when he [or she] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf,* 511 U.S. at 269 & 280, 114 S.Ct. 1483 (emphasis supplied).

The second reason Plaintiffs' *Landgraf* argument fails is that *Landgraf* provides that the "first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules." 511 U.S. at 280, 114 S.Ct. 1483. No one disputes that, in enacting NACARA § 203(a)(1), Congress mandated the application of the stop-time rule to aliens against whom deportation proceedings began prior to IIRIRA. Therefore, even assuming that NACARA § 203(a)(1) constituted the retroactive application of a statutory provision, there would be need for this Court to apply the judicial presumptions against the retroactive application of new statutes because Congress expressly provided for this "retroactive" application.

*VIII.   Estoppel Claim*

A party asserting estoppel must establish the following three elements of a traditional equitable-estoppel claim: (1) "words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things" (2) "wilfulness or negligence with regard to the acts, conduct or

acquiescence" and (3) "detrimental reliance by the other party upon the state of things so indicated." *Federal Deposit Ins. Corp. v. Harrison,* 735 F.2d 408, 413 (11th Cir.1984)

However, the Supreme Court has never resolved whether, and in what manner, the doctrine of equitable estoppel can be applied against the federal government. The Court has intimated that estoppel against the government may not be available at all. *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) ("In sum, Courts of Appeals have taken our statements as an invitation to search for an appropriate case in which to apply estoppel against the Government, yet we have reversed every finding of estoppel that we have reviewed."). Although the Court has not adopted a per se rule prohibiting the application of estoppel against the government, the Court has clarified on numerous occasions that "the government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Serv. of Crawford,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *Richmond,* 496 U.S. at 423-24, 110 S.Ct. 2465 (declining to adopt a rule prohibiting estoppel against the government). Moreover, in its decisions declining to adopt a prohibition on estoppel against the government, the Court has consistently suggested that, if available at all, estoppel against the government depends on a showing of affirmative misconduct. *Richmond,* 496 U.S. at 421, 110 S.Ct. 2465 ("Our own opinions have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government."); *INS v. Miranda,* 459 U.S. 14, 19, 103 S.Ct. 281, 74 L.Ed.2d 12, (1982) (per curiam ) ("This case does not require us to reach the question we reserved in *Hibi,* whether affirmative misconduct in a particular case would estop the Government from enforcing the immigration laws"); *INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam ) ("While the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open in *Montana v. Kennedy,* 366 U.S. 308, 314, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), no conduct of the sort there adverted to was involved here."); *Montana,* 366 U.S. at 314-15, 81 S.Ct. 1336 (noting that "we need not stop to inquire whether, as some lower courts have held, there may be circumstances in which the

25

United States is estopped to deny citizenship because of the conduct of its officials" because the conduct alleged fell "far short of misconduct" that could support estoppel).

Largely following the Supreme Court's admonition that the government cannot be estopped on the same terms as a private litigant, every other circuit has concluded that establishing estoppel by a private party against the government requires a showing of affirmative misconduct. *United States v. Javier Angueira,* 951 F.2d 12, 16 (1st Cir.1991); *Drozd v. INS,* 155 F.3d 81, 90 (2d Cir.1998); *Fredericks v. Commissioner,* 126 F.3d 433, 438 (3rd Cir.1997); *United States v. Agubata,* 60 F.3d 1081, 1083 (4th Cir.1995); *Fano v. O'Neill,* 806 F.2d 1262, 1265 (5th Cir.1987); *United States v. Guy,* 978 F.2d 934, 937 (6th Cir.1992); *Edgewater Hosp., Inc. v. Bowen,* 857 F.2d 1123, 1138 (7th Cir.1988), *amended on other grounds,* 866 F.2d 228 (7th Cir.1989); *United States v. Schoenborn,* 860 F.2d 1448, 1451 (8th Cir.1988); *Watkins v. United States Army,* 875 F.2d 699, 707 (9th Cir.1989); *Penny v. Giuffrida,* 897 F.2d 1543, 1547 (10th Cir.1990); *LaRouche v. Federal Election Com'n,* 28 F.3d 137, 142 (D.C.Cir.1994); *Henry v. United States,* 870 F.2d 634, 637 (Fed.Cir.1989).

On the other hand, this Court has thus far found it unnecessary to resolve the issue of whether a showing of affirmative misconduct is required to estop the federal government. *Feldman v. Commissioner,* 20 F.3d 1128, 1134 (11th Cir.1994); *Bokum v. Commissioner,* 992 F.2d 1136, 1141 (11th Cir.1993); *Brundidge Banking Co. v. Pike County Agr. Stabilization and Conservation Comm.,* 899 F.2d 1154, 1161 n. 5 (11th Cir.1990). In each of these cases, we have concluded that because the party seeking to estop the government had not established the traditional elements of estoppel, it was unnecessary to reach the issue of whether a showing of affirmative misconduct was necessary. *Feldman,* 20 F.3d at 1134; *Bokum,* 992 F.2d at 1141; *Brundidge Banking,* 899 F.2d at 1161. The time has come to decide the issue.

In this appeal, we hold that to establish a claim for equitable estoppel against the government, the party seeking to establish estoppel must prove, in addition to the traditional elements of estoppel, some affirmative misconduct by the government. The Supreme Court repeatedly has said that the government

26

cannot be estopped on the same terms as a private party, if the government can ever be estopped. *See, e.g., Heckler,* 467 U.S. at 60, 104 S.Ct. 2218. We agree that a rule requiring misconduct as an essential element of establishing estoppel against the government is the best way to follow the Supreme Court's command until the Court definitively determines whether and under what circumstances estoppel can be asserted against the government.

In light of this holding, the district court's finding of a substantial likelihood of success on the merits of Plaintiffs' estoppel claim must be reversed. It is not clear whether the district court believed affirmative misconduct to be an element of estoppel under these circumstances. The district court acknowledged that a showing of affirmative misconduct might be a fourth element of establishing estoppel against the government. However, the district court also noted that the INS "seemed to agree" with Plaintiffs' position that the Eleventh Circuit had declined to adopt misconduct as an element of estoppel.

Although the district court discussed Plaintiffs' theory of INS misconduct, the court's discussion suggests that it did not believe that a showing of affirmative misconduct was necessary to Plaintiffs' estoppel claim. The district court noted evidence that the INS district director knew that Congress was considering altering the physical-residence requirement for suspension at the same time that the INS was encouraging Nicaraguan aliens to apply for suspension of deportation. The Court conceded this evidence was not a " 'smoking gun' on the Plaintiffs' estoppel argument" but found it sufficient to justify discovery on possible misconduct by the INS. Therefore, it does not seem that the district court actually made a finding that Plaintiffs were substantially likely to establish misconduct by the INS. To the extent the district court held that affirmative misconduct was not an essential element of estoppel against the government, the court applied the improper legal standard to Plaintiffs' claims.

On the other hand, if the district court concluded that affirmative misconduct was an element of Plaintiffs' estoppel claim, it erred in accepting Plaintiffs' theory of misconduct. Assuming the INS was aware of a "substantial likelihood" that Congress was going to alter the eligibility requirements for suspension, the

27

INS' contemporaneous actions did not constitute misconduct. The mere knowledge that Congress was considering, and likely to make, changes to the requirements for suspension of deportation did not render wrongful the INS' continuation of an existing program to encourage suspension applications. *Compare Corniel-Rodriguez v. INS,* 532 F.2d 301, 302 (2d Cir.1976) (holding that the State Department's failure to warn an alien, as mandated by applicable regulations, that the alien's pending marriage would void her visa constituted misconduct) *with Mukherjee v. INS,* 793 F.2d 1006 (9th Cir.1986) (holding that a government official's incorrect advice on an immigration matter did not amount to misconduct); *Chien-Shih Wang v. Attorney General of United States,* 823 F.2d 1273 (8th Cir.1987) (holding the INS' negligence and possible bad faith in processing the alien's application for permanent residence did not amount to affirmative misconduct). Congress sometimes appears likely to do things it never actually does, and the INS was entitled to operate under existing law until it was changed. There is no indication that the INS' actions in encouraging suspension applications violated any statute or immigration regulation. Plaintiffs offer no other theory of affirmative misconduct other than that cited by the district court. Plaintiffs' inability even to articulate another possible theory of misconduct further illiterates that they have not, based on the current record, established a likelihood of success on the merits of their estoppel claim.

IX.     *Class-Action Status*

Because certain members of the Plaintiff class have claims that are ripe for resolution, we have reached the merits of this case and hold that the district court erred in finding that Plaintiffs had established a substantial likelihood of success on the merits of their claims. However, we note that significant issues do exist regarding the scope and propriety of the class as certified by the district court. First, the class appears to be overly broad. As defined, the class includes aliens who had applied for but been denied suspension of deportation and aliens who have never applied for suspension. Thus, the definition of the class appears to include aliens without claims that are ripe for resolution. *Reno v. Catholic Social Servs., Inc.,* 509 U.S. 43, 58-59, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) (holding that aliens' claims challenging the INS' regulations

28

interpreting the "continuous physical presence" requirement for legalization under the Immigration Reform and Control Act of 1986 are not ripe until the aliens seek and are denied legalization); *Catholic Social Servs., Inc. v. INS,* --- F.3d ----, Nos. 98-16269 & 98-16423 (9th Cir. June 30, 1999).

Second, the class does not appear to satisfy the commonality requirement of Rule 23(a)(2). In finding a likelihood of success on the merits of Plaintiffs' claims, the district court's reasoning focused, almost exclusively, on INS actions that were directed specifically at the Nicaraguan Plaintiffs. Nevertheless, the district court broadly defined the class to include "[a]ll individuals within the states of Georgia, Alabama and Florida who have been or will be denied suspension of deportation" and did not distinguish between Nicaraguan and nonNicaraguan members of the class. Also, the class as defined by the district court includes groups of aliens whose deportation proceedings are governed by entirely different statutory provisions. While the stop-time rule applies to all aliens in deportation proceedings prior to IIRIRA, IIRIRA's transitional rules govern certain aspects of the deportation proceedings that began before April 1, 1997 if the deportation order was, or will be, entered after October 30, 1996. However, for the most part, the pre-IIRIRA INA governs the deportation proceedings that began prior to April 1, 1997 and concluded before October 30, 1996.

Moreover, the enactment of NACARA after the district court's certification clearly placed the Nicaraguan Plaintiffs in a legal position that differed significantly from the positions of the non-Nicaraguan Plaintiffs. In addition to raising further questions about whether the class satisfied the commonality requirement, the effect of NACARA on the claims asserted by the Nicaraguan Plaintiffs also raises serious questions about whether the named Plaintiffs remain adequate class representatives.

In short, on remand, we direct that, before any further proceedings are conducted relating to the merits of Plaintiffs' claims, the district court reconsider its certification of the class and reexamine whether any of the named Plaintiffs remain appropriate class representatives. Any final determinations on the merits of this case cannot be made until Plaintiffs and their respective claims are accurately identified and defined.

At this juncture, our opinion holds only that Plaintiffs have not established a likelihood of success sufficient to support the broad class-wide injunction entered by the district court.

*X.     Conclusion*

For the foregoing reasons, we conclude that the district court erred in finding that Plaintiffs had established a likelihood of success on the merits of their claims. Accordingly, we conclude that the district court erred in entering its preliminary injunction and in denying the motion to dissolve the injunction. The district court's preliminary injunction is VACATED, and this case is REMANDED for further proceedings consistent with this opinion.