[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13055

_____

Agency No. A029-021-783

ANDRE MARTELLO BARTON,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(September 25, 2018)

Before WILSON and NEWSOM, Circuit Judges, and VINSON,[*] District Judge.

NEWSOM, Circuit Judge:

_____

[*]Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida,
sitting by designation.

The federal immigration laws give the Attorney General the discretion to cancel the removal of an otherwise removable lawful permanent resident who (among other conditions) "has resided in the United States continuously for 7 years after having been admitted in any status."  8 U.S.C. § 1229b(a)(2).  Importantly for present purposes, though, the continuous-residence requirement is subject to the so-called "stop-time rule."  The provision that embodies that rule—at issue here—states that any period of continuous residence terminates when the alien "commit[s] an offense referred to in section 1182(a)(2) of this title that *renders the alien inadmissible* to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest."  *Id*. § 1229b(d)(1) (emphasis added).

The question before us is whether a lawful-permanent-resident alien who has already been admitted to the United States—and who isn't currently seeking admission or readmission—can, for stop-time purposes, be "render[ed] … inadmissible" by virtue of a qualifying criminal conviction.  Other circuits have divided over the answer.  For slightly different reasons, the Second and Fifth Circuits have both held that a lawful permanent resident needn't apply for admission to be "render[ed] … inadmissible" under the stop-time rule (as has the Third Circuit, albeit in an unpublished opinion).  *See Heredia v. Sessions*, 865 F.3d 60, 67 (2d Cir. 2017); *Calix v. Lynch*, 784 F.3d 1000, 1008–09 (5th Cir. 2015);

*Ardon v. Att'y Gen. of U.S.*, 449 Fed. App'x 116, 118 (3d Cir. 2011).  More recently, the Ninth Circuit disagreed, concluding that "a lawful permanent resident cannot be 'rendered inadmissible' unless he is seeking admission." *Nguyen v. Sessions*, __ F.3d ___, 2018 WL 4016761, at *5 (9th Cir. Aug. 23, 2018).

For the reasons that follow, we agree with the Second, Third, and Fifth Circuits, and disagree with the Ninth.

**I**

**A**

Andre Martello Barton is a native and citizen of Jamaica.  Barton was initially admitted to the United States on May 27, 1989 as a B-2 visitor for pleasure; approximately three years later, he successfully adjusted his status to lawful permanent resident.  Since his admission, Barton has run afoul of the law on several occasions.  Initially, on January 23, 1996—for reasons that will become clear, the dates matter—Barton was arrested and charged with three counts of aggravated assault and one count each of first-degree criminal damage to property and possession of a firearm during the commission of a felony.  He was convicted of all three offenses in July 1996.  Then, a little more than a decade later—first in 2007 and then again in 2008—Barton was charged with and convicted of violating the Georgia Controlled Substances Act.  (For present purposes, only Barton's 1996 crimes are relevant to determining whether he is eligible for cancellation of

3

removal.  Barton's 2007 and 2008 offenses occurred more than seven years after his admission to the United States—which, as we will explain, is the pertinent timeframe for establishing continuous residence under the cancellation statute.)

The Department of Homeland Security subsequently served Barton with a notice to appear, charging him as removable on several grounds: (1) under 8 U.S.C. § 1227(a)(2)(A)(iii), for being convicted of an aggravated felony related to drug trafficking; (2) under 8 U.S.C. § 1227(a)(2)(B)(i), for violating controlled-substance laws; (3) under 8 U.S.C. § 1227(a)(2)(C), for being convicted of illegally possessing a firearm; and (4) under 8 U.S.C. §1227(a)(2)(A)(ii), for being convicted of two crimes involving moral turpitude not arising out of a single scheme.  Barton admitted the factual allegations in the notice and conceded removability based on the controlled-substance and gun-possession offenses, but denied that he had been convicted of a trafficking-related aggravated felony or of two crimes involving moral turpitude not arising out of a single scheme.  Barton also indicated that he intended to seek cancellation of removal as a lawful permanent resident.  The immigration judge sustained the two conceded charges of removability, and the government later withdrew the other two charges.

## B

As promised, Barton subsequently filed an application for cancellation of removal under 8 U.S.C. § 1229b(a), which, as already explained, allows the

4

Attorney General to cancel the removal of an otherwise removable lawful-permanent-resident alien if—in addition to other requirements not relevant here—the alien "has resided in the United States continuously for 7 years after having been admitted in any status." 8 U.S.C. § 1229b(a)(2). Importantly, though—as also explained—the continuous-residence requirement is subject to the "stop-time rule," which terminates the accrual of continuous residence when the alien commits a crime that (1) is listed in 8 U.S.C. § 1182(a)(2) and (2) that renders the alien either "inadmissible" under § 1182(a)(2) or "removable" under 8 U.S.C. § 1227(a)(2) or (a)(4). *Id.* § 1229b(d)(1)(B).

In his cancellation application, Barton acknowledged his prior criminal convictions and included as exhibits records that, as relevant here, showed that he had committed the crimes that resulted in his convictions for aggravated assault, criminal damage to property, and unlawful gun possession on January 23, 1996. The government moved to pretermit Barton's application, arguing that Barton hadn't accrued the required seven years of continuous residence after his May 27, 1989 admission because, under the stop-time rule, his continuous-residence period ended on January 23, 1996.

In response, Barton contended that his 1996 crimes didn't trigger the stop-time rule. As to § 1229b(d)(1)'s "removable" prong, Barton said that his 1996 offenses didn't qualify because they arose from a single scheme of misconduct

constituting one crime involving moral turpitude committed outside his first five years in the United States, whereas the cross-referenced § 1227(a)(2) establishes removability, as relevant here, only for (i) a single crime involving moral turpitude committed within five years of an alien's admission or (ii) multiple crimes involving moral turpitude not arising out of a single scheme. The government didn't press—and has since abandoned—the argument that Barton's 1996 crimes rendered him "removable" for stop-time purposes. Instead, it insisted that Barton's 1996 offenses—even if considered as a single crime involving moral turpitude occurring outside the five-year timeframe—rendered Barton "inadmissible" under § 1182(a)(2), which unlike removability under § 1227(a)(2) isn't limited by a single-scheme requirement. Barton replied—thus teeing up the issue before us— that as an already-admitted lawful permanent resident not seeking admission (or readmission) to the United States, he could not as a matter of law be "render[ed] … inadmissible" within the meaning of § 1229b(d).

The immigration judge ruled in the government's favor, concluding that Barton's 1996 offenses "render[ed]" him "inadmissible" under § 1182(a)(2), thereby triggering § 1229b(d)(1)'s stop-time rule, thereby prematurely ending his period of continuous residence in the United States, thereby disqualifying him for cancellation of removal.

## C

Barton sought review of the IJ's order in the Board of Immigration Appeals, reiterating his argument that a lawful-permanent-resident alien not seeking admission to the United States can't be "render[ed] inadmissible" under § 1182(a)(2) for stop-time purposes. In a non-precedential single-member decision, the Board agreed with the IJ, concluding that Barton's 1996 offenses triggered the stop-time rule and thus forestalled his accrual of the requisite seven years of continuous residence. Citing its earlier decision in *Matter of Jurado-Delgado*, 24 I. & N. Dec. 29 (B.I.A. 2006), the Board (per the lone member) held that Barton's convictions barred him from seeking cancellation of removal because—so far as we can tell from a very summary order—the phrase "renders the alien inadmissible" in § 1229b(d)(1)'s stop-time rule requires only that the applicant be "potentially" inadmissible, not that he be actively seeking admission.

Barton now petitions for review of the Board's decision. He asserts, as he has all along, that as a lawful permanent resident he "plainly cannot be inadmissible as a result of any offense, as he is not seeking admission to the United States." Br. of Petitioner at 8.

## II

Under the principle announced in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "[a]s a general rule, an agency's

interpretation of a statute which it administers is entitled to deference if the statute is silent or ambiguous and the interpretation is based on a reasonable construction of the statute." *Fajardo v. U.S. Att'y Gen.*, 659 F.3d 1303, 1307 (11th Cir. 2011). And to be clear, the Supreme Court has held that *Chevron* deference applies with full force when the Board of Immigration Appeals interprets ambiguous statutory terms in the course of ordinary case-by-case adjudication. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999). But so do *Chevron*'s limitations. Accordingly, here as elsewhere, if we determine—employing "traditional tools of statutory construction"—that "Congress has spoken clearly, we do not defer to [the] agency's interpretation of the statute," because "we must give effect to the unambiguously expressed intent of Congress." *Fajardo*, 659 F.3d at 1307 (quoting *Chevron*, 467 U.S. at 842–44).

The threshold question before us, therefore—at *Chevron* step one, so to speak—is whether the usual rules of statutory interpretation provide a clear answer to the following question:  Can a lawful-permanent-resident alien who is not presently seeking admission to the United States nonetheless be "render[ed] … inadmissible" within the meaning of 8 U.S.C. § 1229b(d)(1)?  Although it is undoubtedly true that "the concept of inadmissibility is generally married to situations in which an alien is actually seeking admission to the United States," *Calix v. Lynch*, 784 F.3d 1000, 1004 (5th Cir. 2015), for the reasons that follow,

8

we hold that an already-admitted lawful permanent resident—who doesn't need and isn't seeking admission—*can* be "render[ed] … inadmissible" for stop-time purposes.

## A

Any application of the "traditional tools of statutory construction," of course, must begin "with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (internal quotation marks omitted). At issue here (again) is the stop-time rule, which (again) terminates the seven years of continuous residence that a lawful permanent resident must accrue in order to qualify for cancellation of removal. In relevant part, the stop-time rule provides as follows:

> [A]ny period of continuous residence … in the United States shall be deemed to end … when the alien has committed an offense referred to in section 1182(a)(2) of this title that renders the alien inadmissible to the United States under section 1182(a)(2) of this title or removable from the United States under section 1227(a)(2) or 1227(a)(4) of this title, whichever is earliest.

8 U.S.C. § 1229b(d)(1).

Because the parties here agree that Barton is not ineligible for cancellation of removal on account of having committed an offense that rendered him "removable" under § 1227(a)(2) or § 1227(a)(4), the sole question before us is whether his 1996 convictions rendered him "inadmissible" under § 1182(a)(2).

9

Barton's position is simply stated:  He says that he "plainly cannot be *inadmissible* as a result of any offense, as he is not seeking *admission* to the United States."  Br. of Petitioner at 8 (emphasis added).  Although Barton's argument has a certain intuitive appeal, we conclude that § 1229b(d)(1)'s plain language forecloses it.

We begin our textual analysis where Barton does—with the word "inadmissible."  Standard English-language dictionaries all seem to define "inadmissible" in pretty much the same way: "Not admissible; not proper to be allowed or received."  *Webster's Second New International Dictionary* 1254 (1944); *see also, e.g.*, *Webster's Third New International Dictionary* 1139 (2002) (same); *Oxford English Dictionary* (3d ed. 2011) ("[n]ot admissible; not to be admitted, entertained, or allowed").  Unsurprisingly, those same dictionaries similarly define the root word "admissible": "Capable of being or having the right to be admitted to a place."  *Oxford English*; *see also, e.g.*, *Webster's Second* at 34 ("[e]ntitled or worthy to be admitted"); *Webster's Third* at 28 (same).  So, in short, an alien like Barton is "inadmissible" if he isn't "proper[ly]"—or doesn't "hav[e] the right to be"—present in the United States.

On, then, to the word "renders," which precedes "inadmissible."  Barton asserts that Congress's use of that term—such that the alien must commit an offense that "renders" him "inadmissible"—"requires certain factual circumstances to be in existence to be operative," and thus that it "makes most sense for Congress

10

to have used 'renders' inadmissible to apply to those seeking admission …." Br. of Petitioner at 12–13. We disagree that the term "renders" necessitates (or even properly suggests) so narrow a reading. Turning again to the dictionaries, we find that they almost uniformly define "render" to mean "to cause to be or to become." *E.g.*, *Webster's Second New International Dictionary* 2109 (1944); *Webster's Third New International Dictionary* 1922 (2002) (same); *Oxford English Dictionary* (3d ed. 2011) (same). Some, interestingly—and we think tellingly—go on to explain that the word "render" can indicate the conferral of a particular condition, or "state." *Webster's Second* at 2109; *Webster's Third* at 1922.

A "state"-based understanding makes particularly good sense here, where the word that follows "renders" is "inadmissible." *Cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (emphasizing that a statutory term's meaning should be determined by reference to "the specific context in which [it] is used"). By their very nature, "able" and "ible" words[1] connote a person's or thing's character, quality, or status—which, importantly for present purposes, exists independent of any particular facts on the ground, so to speak. Consider, for instance, the following example, taken from one dictionary's definition of the word "render": "Sewage effluent leaked into a well, grossly contaminating the water and rendering

---

[1] For an explanation of the differences—why sometimes "able" and sometimes "ible"?—*see* Catherine Soanes, *Do you know your -ibles from your -ables?*, Oxford Dictionaries: OxfordWords (Oct. 23, 2013), https://blog.oxforddictionaries.com/2012/10/23/ibles-and-ables/ (last visited Sept. 15, 2018).

11

it *undrinkable* for 24 hours." *Oxford English* (emphasis added). The described water isn't properly drunk for a full day—whether or not anyone is actually trying to drink it. It is, by its very nature, not drinkable. Here's another, again from a dictionary definition of "render": "[T]he rains rendered his escape *impossible*." *Oxford Dictionary of English* 1503 (3d ed. 2010) (emphasis added). Because of the rains, the unidentified captive's escape couldn't be made—whether or not he was actually trying to make it. Similar illustrations abound: A terminal illness renders its victim *untreatable* regardless of whether she is actively seeking treatment; rot renders a piece of fish *inedible* regardless of whether someone is trying to eat it; sheer weight renders a car *immovable* regardless of whether someone is trying to move it. You get the point. So too here—an alien can be rendered *inadmissible* regardless of whether he is actually seeking admission.

We simply cannot discern in § 1229b(d)(1)'s text any indication that in order to be "render[ed] … inadmissible" within the meaning of the stop-time rule, an alien *must* presently be seeking admission. Rather, an alien is "render[ed] … inadmissible" when he is "cause[d] to be or to become" not "proper[ly]" or "right[ly]" admitted. In other words, "inadmissib[ility]" is a *status* that an alien assumes by virtue of his having been convicted of a qualifying offense under § 1182(a)(2). True, for an alien like Barton, who has already been admitted—and isn't currently seeking admission—that status might not immediately produce real-

12

world admission-related consequences.  But it isn't categorically irrelevant to admission either; rather, it may just be that the otherwise-latent status manifests somewhere down the road.  Barton is of course correct that, as a general rule, an already-admitted lawful permanent resident needn't seek readmission to the United States.  There are exceptions, however.  For instance, a once-admitted alien may need readmission if he "has abandoned or relinquished [lawful-permanent-resident] status," "has been absent from the United States for a continuous period in excess of 180 days," or "has engaged in illegal activity after having departed the United States."  8 U.S.C. § 1101(a)(13)(C).  (Importantly, the term of "inadmissib[ility]" imposed by § 1182(a)(2) has no sunset; once an alien is "render[ed] …  inadmissible" under the statute, he retains that status indefinitely.)[2]

So as a matter of both linguistics and logic, at least for stop-time purposes, a lawful permanent resident can—contrary to Barton's contention—be "render[ed] … inadmissible" even if he isn't currently seeking (and for that matter may never again seek) admission to the United States.

---

[2] In *Nguyen*, the Ninth Circuit acknowledged that § 1101(a)(13)(C) specifies circumstances in which a lawful permanent resident might have to seek readmission, but answered that none of them applied in the case before it.  __ F.3d ___, 2018 WL 4016761, at *3.  With respect, we think that misses the point—which isn't whether the particular alien before the court himself needs readmission right now, but rather whether a once-admitted alien might someday need readmission, such that his "inadmissible" status would matter.  Clearly he might, such that it would.

13

**B**

In resisting this plain-language interpretation, Barton relies principally on the rule against surplusage—which cautions against needlessly reading a statute in a way that renders (pun fully intended) certain language superfluous. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001). In particular, Barton asserts—

> If an offense referred to in 8 U.S.C. § 1182(a)(2), to wit, a [crime involving moral turpitude], categorically render[s] an alien inadmissible and trigger[s] the stop-time rule, without respect to whether that individual is actually seeking admission, then there would be no need to consider whether, in the alternative, the offense render[s] the alien removable under 8 U.S.C. § 1227(a)(2) or (a)(4).

Br. of Petitioner at 11.

Although we find Barton's surplusage-based argument a little hard to follow, he seems to be saying something like the following. At the outset, he correctly recognizes that in order to trigger § 1229b(d)(1)'s stop-time rule, two conditions must be met: first, the alien must have "committed an offense referred to in section 1182(a)(2)"; second, and separately, that offense must "render[] the alien" either "inadmissible … under section 1182(a)(2)" or "removable … under section 1227(a)(2) or 1227(a)(4) …." *See Heredia v. Sessions*, 865 F.3d 60, 66–67 (2d Cir. 2017) (explaining the "stop-time rule as having two requirements"); *Calix*, 784 F.3d at 1006 (same). From that starting point, and presumably fastening on the fact that both § 1229b(d)(1)'s prefatory "referred to" clause and the "inadmissible" prong of the statute's operative clause cross-reference § 1182(a)(2), Barton appears

14

to contend that an alien's commission of any § 1182(a)(2)-based crime that meets the threshold "referred to" condition will also *ipso facto* "render[] the alien inadmissible under section 1182(a)(2)." Thus, he says, there will never be a need to proceed to determine whether a crime qualifies under the operative clause's separate § 1227(a)-based "removable" prong—hence, the argument goes, the surplusage. Barton's solution: Courts should read the stop-time rule "so that the inadmissibility part applies to permanent residents seeking admission, and the [removability] part applies to those permanent residents in the United States already, not seeking admission …." Br. of Petitioner at 11.

We reject Barton's argument for two reasons. As an initial matter, the Supreme Court has repeatedly explained that the usual "preference" for "avoiding surplusage constructions is not absolute" and that "applying the rule against surplusage is, absent other indications, inappropriate" when it would make an otherwise unambiguous statute ambiguous. *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004) (citing *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001)). Rather, faced with a choice between a plain-text reading that renders a word or clause superfluous and an interpretation that gives every word independent meaning but, in the doing, muddies up the statute—courts "should prefer the plain meaning since that approach respects the words of Congress." *Id*. Because, as we have explained, the statutory language here is clear, it is unnecessary—and in the

15

Supreme Court's words, would be "inappropriate"―to apply the anti-surplusage canon here.

Moreover, and in any event, Barton's surplusage-based argument misunderstands the stop-time rule's operation.  Contrary to Barton's assumption, answering "yes" to the first question—whether the alien has "committed an offense referred to in section 1182(a)(2)"—does *not* necessarily require a "yes" to the second question—whether that offense "renders the alien inadmissible … under section 1182(a)(2)."  The reason is that while the mere "commi[ssion]" of a qualifying offense satisfies the prefatory clause, actually "render[ing] the alien inadmissible" demands more.  Under § 1182(a)(2), an alien "is inadmissible"— here, as a result of a "crime involving moral turpitude"—only if he is "convicted of, or … admits having committed, or … admits committing acts which constitute the essential elements of" the listed offense.  8 U.S.C. § 1182(a)(2)(A)(i)(I).  In short, while only commission is required at step one, conviction (or admission) is required at step two.  *See Calix*, 784 F.3d at 1006 ("If an alien has committed an offense listed [in § 1182(a)(2)], does inadmissibility automatically result?  It does not."); *see also Heredia*, 865 F.3d at 66–67 (recognizing commission-conviction distinction).[3]

---

[3] There is one clarification worth making here.  Although it is an alien's conviction of a qualifying offense that "renders [him] inadmissible" for stop-time purposes, his period of continuous residence is deemed to terminate on the date he initially committed that offense.  So,

So contrary to Barton's contention, there is no surplusage. The statutory language that he assails as superfluous is in fact the second of two independent requirements, both of which are necessary to trigger the stop-time rule.[4]

### III

For the foregoing reasons, we hold, per the stop-time provision's plain language, that a lawful-permanent-resident alien need not be seeking admission to the United States in order to be "render[ed] … inadmissible." Accordingly, the Board correctly concluded that Barton is ineligible for cancellation of removal because the stop-time rule—triggered when he committed a crime involving moral turpitude in January 1996—ended his continuous residence a few months shy of the required seven-year period.[5]

---

in effect, his conviction-based inadmissibility "relates back" (our term) to the date of the crime's commission. *See, e.g.*, *Heredia*, 865 F.3d at 70–71 ("[W]hen a non-citizen is rendered inadmissible—by a conviction, admission of the criminal conduct, or through some other means—the stop-time rule may make him ineligible for cancellation of removal, if, as of the date of his *commission* of the underlying offense, he had not yet resided in the United States continuously for seven years. To state it another way: as long as a qualifying offense later *does* render the non-citizen inadmissible under 8 U.S.C. § 1182(a)(2), the date of the *commission* of the offense governs the computation of a lawful permanent resident's continuous residency in the United States.").

[4] Although the Ninth Circuit embraced a version of this surplusage-based argument in *Nguyen*, *see* __ F.3d ___, 2018 WL 4016761, at *3, it failed to account for the fact that while commission of a crime alone satisfies § 1229b(d)(1)'s prefatory clause, the operative "render[ing]" clause requires more—either a conviction of or a formal admission to the underlying offense.

[5] Because we conclude that the stop-time provision's statutory language is unambiguous, we needn't definitively determine whether, as the government contends, the Board's decision here—which the parties agree is a non-precedential single-member order—is entitled to *Chevron* deference. *See Chevron*, 467 U.S. at 842 ("If the intent of Congress is clear, that is the end of the matter."). We note, though, that in *Quinchia v. U.S. Attorney General*, this Court held that

**PETITION DENIED.**

---

"*Chevron* deference is not appropriate[ly]" afforded to "a non-precedential decision issued by a single member of the [Board] that does not *rely on* existing [Board] or federal court precedent." 552 F.3d 1255, 1258 (11th Cir. 2008) (emphasis added). *Quinchia* further indicates that a single-member Board decision should be deemed to have "rel[ied] on" existing precedent for *Chevron* purposes only where it is actually dictated—or "compelled"—by an earlier decision. *See id.* at 1258 (citing *Garcia–Quintero v. Gonzales,* 455 F.3d 1006, 1011–14 (9th Cir. 2006), for the proposition that "*Chevron* deference may apply where the non-precedential [Board] decision relied on, and was 'compelled by' an earlier precedential decision"); *cf. Silva v. United States Att'y Gen.,* 448 F.3d 1229, 1243 (11th Cir. 2006) (holding that it is permissible under 8 C.F.R. § 1003.1(e)(4)(i)(A) for the Board to summarily affirm the decision of the immigration judge without opinion when, among other conditions, the issues "are governed by existing precedent").

It is true, as the government says, that the single-member opinion here cited (parenthetically) the Board's earlier decision in *Matter of Jurado-Delgado* for the proposition that "the phrase 'renders the alien admissible … or removable' in section [1229b(d)(1)] requires only that an alien 'be or become' inadmissible or removable, i.e., be potentially removable if so charged," 24 I. & N. Dec. 29, 31 (B.I.A. 2006). But as the Fifth Circuit has correctly explained, "[t]he [Board] in *Jurado-Delgado* clearly answered one narrow question," which is similar, but not identical, to the one presented here: "It held that an alien could be charged with removal on one ground and be ineligible for cancellation of removal because of another ground. The opinion does not explicitly answer whether a lawful permanent resident who does not need to be admitted nonetheless has his period of continuous residence stopped by an offense rendering him inadmissible." *Calix*, 784 F.3d at 1009. Because the single-member decision here required an extension (or at least a refinement) of *Jurado-Delgado*, we doubt that it qualifies under *Quinchia* as one that "rel[ies] on" existing Board precedent.

One of the principal justifications for granting deference to administrative agencies is that they operate pursuant to regular procedures that ensure thorough consideration and vetting of interpretive issues. *See Chevron*, 467 U.S. at 865 (basing policy of deference, in part, on the conclusion that "the agency considered the matter in a detailed and reasoned fashion"). When, as here, those procedures are short-circuited, that justification evaporates. *Cf. Rotimi v. Gonzales*, 473 F.3d 55, 57–58 (2d Cir. 2007) (refusing to give *Chevron* deference to a single-member Board decision because (1) the Board itself affords such decisions no precedential weight and (2) the Board's governing regulations provide that it has a duty to provide "clear and uniform guidance […] on the proper interpretation and administration" of the immigration laws, which it shall do through precedential decisions) (cited in *Quinchia*, 552 F.3d at 1258).

18