[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10197
_____

Agency No. A043-024-298

CARLOS EDUARDO RENDON

Petitioner,

versus

UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 26, 2020)

Before MARTIN, NEWSOM, and BALDOCK,* Circuit Judges.

MARTIN, Circuit Judge:

_____

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting
by designation.

The Government's "Unopposed Motion to Amend the Decision" is GRANTED.  The opinion issued in this case on July 14, 2020 is VACATED, and this opinion, amended in accordance with the Government's request, is issued in its stead.

Carlos Rendon began living in the United States as a lawful permanent resident in 1991.  Then in 1995, he pled guilty to resisting a police officer with violence.  Under immigration law this offense qualifies as a crime involving moral turpitude ("CIMT").  At the time, Mr. Rendon's sentence of 364 days in state custody did not affect his status as a lawful permanent resident.  But Congress later changed the law.  In 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") made him deportable based on his CIMT conviction.  And in 1997, the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") created the "stop-time rule," which meant people convicted of certain crimes were no longer eligible for a discretionary form of relief known as cancellation of removal.  Approximately 25 years after his guilty plea, an immigration judge found Mr. Rendon removable and ruled he was no longer eligible for cancellation of removal on account of the stop-time rule.  On appeal, Mr. Rendon now argues that it was error to retroactively apply the stop-time rule to his pre-IIRIRA conviction.  After careful review, we conclude that Mr. Rendon is right.  We reverse the decision of the Board of Immigration Appeals and remand for further proceedings.

**I.**

Mr. Rendon is a native and citizen of Colombia who was admitted to the United States as a lawful permanent resident on June 5, 1991. On February 15, 1995, Mr. Rendon was arrested and charged under Florida law with one count of burglary with assault; three counts of battery on a law enforcement officer; two counts of battery; and one count of resisting an officer with violence. On July 17, 1995, Mr. Rendon pled guilty to all charges and was sentenced to 364-days imprisonment. On February 3, 1995, Mr. Rendon was arrested for possession of cannabis. He was convicted of that possession offense on January 10, 1996.

On July 19, 2013, the Department of Homeland Security served Mr. Rendon with a notice to appear ("NTA"). The NTA charged him with being removable based on his conviction for a CIMT within five years of his admission, 8 U.S.C. § 1227(a)(2)(A)(i), and his conviction for possessing a controlled substance, 8 U.S.C. § 1227(a)(2)(B)(i). Mr. Rendon conceded removability as to his controlled substance offense and denied removability as to his CIMT conviction.

On January 14, 2016, the immigration judge ("IJ") sustained the charge of removability for Mr. Rendon's CIMT conviction. Mr. Rendon then told the IJ he was seeking cancellation of removal under 8 U.S.C. § 1229b(a). The government opposed Mr. Rendon's request for cancellation of removal, arguing that he was ineligible for this relief because, under the stop-time rule, 8 U.S.C. § 1229b(d)(1),

his convictions terminated his accrual of the continuous presence required for him to be eligible for this relief.  On September 8, 2016, the IJ issued an oral decision ordering Mr. Rendon removed to Colombia.  Mr. Rendon appealed to the Board of Immigration Appeals ("BIA").  He argued that applying the stop-time rule to his 1995 convictions was an impermissible retroactive application of IIRIRA, which did not come into effect until April 1, 1997.

The BIA remanded Mr. Rendon's case to the IJ for a full written decision.  On January 29, 2018, the IJ issued a written decision denying Mr. Rendon's application for cancellation of removal.  The IJ found Mr. Rendon's conviction for resisting an officer with violence was a CIMT which, under the stop-time rule, prevented him from accruing the seven years of continuous presence required to be eligible for cancellation of removal.  Mr. Rendon again appealed to the BIA, challenging only the IJ's application of the stop-time rule to his 1995 conviction.  The BIA affirmed the ruling of the IJ and dismissed Mr. Rendon's appeal.  Mr. Rendon timely petitioned this Court for review.

## II.

We review de novo our jurisdiction to review a petition for review of a BIA decision.  See Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006) (per curiam).  We review de novo legal and constitutional questions.

4

Cole v. U.S. Att'y Gen., 712 F.3d 517, 523 (11th Cir. 2013), abrogated on other grounds by Nasrallah v. Barr, 590 U.S. ___, 140 S. Ct. 1683 (2020).

## III.

This case presents a single legal question. That is whether applying the stop-time rule to Mr. Rendon's conviction from before the rule was enacted would be impermissibly retroactive. But before turning to that question, we must first address whether we have jurisdiction to consider Mr. Rendon's petition for review. The government says 8 U.S.C. § 1252(a)(2)(C) strips us of jurisdiction to review Mr. Rendon's petition. Despite the government's argument, we conclude that we do have jurisdiction over the issues raised in Mr. Rendon's petition.

Section 1252(a)(2)(C) strips appellate courts of jurisdiction to review any final order of removal against a noncitizen who is removable for a controlled substance offense. See Lopez v. U.S. Att'y Gen., 914 F.3d 1292, 1297 (11th Cir. 2019); Jeune v. U.S. Att'y Gen., 810 F.3d 792, 799 (11th Cir. 2016). Mr. Rendon conceded removability based on his controlled substance conviction, so the government is correct to say that § 1252(a)(2)(C) narrows our review of his removal order.

But the government is wrong to say that § 1252(a)(2)(C) limits our review only to legal questions that implicate constitutional rights. This limitation has not existed since the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119

5

Stat. 231.  In relevant part, the REAL ID Act amended 8 U.S.C. § 1252 by adding

§ 1252(a)(2)(D).  Real ID Act § 106(a)(1)(A)(iii).  That subsection restored the

jurisdiction of appellate courts to review "constitutional claims or questions of

law," even where review would otherwise be barred by § 1252(a)(2)(C).  See id.;

Malu v. U.S. Att'y Gen., 764 F.3d 1282, 1289 (11th Cir. 2014); Chacon-Botero v.

U.S. Att'y Gen., 427 F.3d 954, 957 (11th Cir. 2005) (per curiam).[1]  And for Mr.

Rendon's case, the question of whether a statute should be given retroactive effect

is a question of law.  Goldsmith v. City of Atmore, 996 F.2d 1155, 1159 (11th Cir.

1993).  For that reason, under § 1252(a)(2)(D) we retain jurisdiction over Mr.

Rendon's petition for review.  See Malu, 764 F.3d at 1289 (explaining that under

§ 1252(a)(2)(D), this Court retains jurisdiction to review "the application of an

undisputed fact pattern to a legal standard" in cases governed by § 1252(a)(2)(C)

(quotation marks omitted)).

## IV.

Mr. Rendon challenges the BIA's holding that the stop-time rule makes him

ineligible for cancellation of removal.  He argues that because he pled guilty before

the stop-time rule was enacted, applying the stop-time rule retroactively to his

---

[1] The cases on which the government relies in support of its position pre-date the passage of the REAL ID Act and so are unpersuasive on this point.  See Br. of Resp't at 18 (citing Balogun v. U.S. Att'y Gen., 304 F.3d 1303, 1311 (11th Cir. 2002), Oguejiofor v. U.S. Att'y Gen., 277 F.3d 1305, 1309 (11th Cir. 2002) (per curiam), and Tefel v. Reno, 180 F.3d 1286, 1301–02 (11th Cir. 1999)).

conviction is impermissible. To begin, we find no clear congressional statement that the stop-time rule should be applied retroactively to pre-IIRIRA plea agreements like Mr. Rendon's. And we hold that in the circumstances presented here—specifically, where Mr. Rendon's pre-IIRIRA plea agreement did not render him immediately deportable—applying the stop-time rule to Mr. Rendon's 1995 conviction would have an impermissibly retroactive effect. For these reasons, we conclude that the BIA erred by applying the stop-time rule to Mr. Rendon's pre-IIRIRA conviction.

### A.

We find it helpful at the outset to briefly review the development of the law governing cancellation of removal. Permanent residents who, like Mr. Rendon, are found to be removable may apply for and be eligible to receive cancellation of their removal, which allows them to remain in the United States despite being removable. See 8 U.S.C. § 1229b(a). Congress created cancellation of removal in IIRIRA, replacing similar forms of relief known as waiver of deportation and suspension of deportation. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 304(a)(3), 110 Stat. 3009; Innab v. Reno, 204 F.3d 1318, 1319 & n.1 (11th Cir. 2000). But in substance, cancellation of removal is little more than "a new name for essentially unchanged discretionary relief from immigration sanctions." Jeudy v. Holder, 768

F.3d 595, 604 (7th Cir. 2014).  And this type of discretionary relief has "been a fixture of immigration law in different forms since 1917."  Id. (citing INS v. St. Cyr, 533 U.S. 289, 293–96, 121 S. Ct. 2271, 2275–77 (2001)); see also 143 Cong. Rec. S12,266 (daily ed. Nov. 9, 1997) (explanatory memorandum submitted by Sens. Mack, Graham, Abraham, Kennedy, and Durbin) (noting that the standards for cancellation of removal "generally echo the standards for suspension of deportation that had been in effect until IIRIRA").

A permanent resident can qualify for cancellation of removal by showing (1) that he has been lawfully admitted to the United States for permanent residence for at least five years; (2) that he has resided in the United States continuously for seven years after having been admitted in any status; and (3) that he has not been convicted of an aggravated felony.  8 U.S.C. § 1229b(a).  Yet, even if he makes these three showings, the stop-time rule can still bar his eligibility.  Under the stop-time rule, a noncitizen stops accumulating time towards the required years of continuous presence if and when (1) he is served with a notice to appear in removal proceedings or (2) he commits an offense that renders him inadmissible under 8 U.S.C. § 1182(a)(2).[2]  8 U.S.C. § 1229b(d)(1).  Like cancellation of removal itself,

---

[2] Qualifying criminal offenses only trigger the stop-time rule once the noncitizen is convicted of or admits to committing a qualifying crime.  See Barton v. U.S. Att'y Gen., 904 F.3d 1294, 1301 (11th Cir. 2018) (citing 8 U.S.C. § 1182(a)(2)(A)(i)(I)), aff'd sub nom. Barton v. Barr, 590 U.S. ___, 140 S. Ct. 1442 (2020).  After a conviction or admission, the stop-time date is then back-dated to the day the offense was committed.  See id. at 1302.

the stop-time rule was added to the Immigration and Nationality Act ("INA") by IIRIRA § 304 and became law on April 1, 1997.

## B.

With this background in mind, we turn to whether the stop-time rule can be retroactively applied to Rendon's 1995 conviction. We know that, so long as Congress stays within constitutional limits, it has the power to enact laws that act retroactively. St. Cyr, 533 U.S. at 316, 121 S. Ct. at 2288. However, "congressional enactments will not be construed to have retroactive effect unless their language requires this result." St. Cyr, 533 U.S. at 315–16, 121 S. Ct. at 2288 (alteration adopted) (quotation marks omitted). This is because "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." Landgraf v. USI Film Prods., 511 U.S. 244, 265, 114 S. Ct. 1483, 1497 (1994). When we require a clear expression of congressional intent before giving statutes retroactive effect, we assure ourselves that Congress has "affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." St. Cyr, 533 U.S. at 316, 121 S. Ct. at 2288 (quotation marks omitted). In the context of immigration, the presumption against retroactivity is further buttressed by "the longstanding principle of construing any

9

lingering ambiguities in deportation statutes in favor of the alien." Id. at 320, 121 S. Ct. at 2290 (quotation marks omitted).

To determine whether the stop-time rule may be applied retroactively to pre-IIRIRA plea agreements, we apply the two-step test described in Landgraf. See Sarmiento Cisneros v. U.S. Att'y Gen., 381 F.3d 1277, 1280 (11th Cir. 2004) (applying Landgraf, 511 U.S. at 280, 114 S. Ct. at 1505). First, we must "determine whether Congress has expressly prescribed the statute's proper reach." Landgraf, 511 U.S. at 280, 114 S. Ct. at 1505. This is a "demanding" test that requires "statutory language that [is] so clear that it could sustain only one interpretation." St. Cyr, 533 U.S. at 316–17, 121 S. Ct. at 2288 (quotation marks omitted). If the statute "contain[s] an express command as to the temporal reach of the statute," thus satisfying Landgraf's first step, the inquiry ends and we give effect to Congress's express wishes. Sarmiento Cisneros, 381 F.3d at 1280. But where there is no express command, we proceed to the second step, which requires us to determine "whether the statute would have an impermissible retroactive effect as applied." Id. (citing Landgraf, 511 U.S. at 280, 114 S. Ct. at 1505). Step two "demands a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." St. Cyr, 533 U.S. at 321, 121 S. Ct. at 2290 (quotation marks omitted).

We address these steps in turn.

1.

Applying the first step of the <u>Landgraf</u> test, we find no clear indication that Congress intended the stop-time rule to be applied retroactively to guilty pleas entered before the effective date of IIRIRA.  Nothing in the text of the stop-time rule or the surrounding statutory text clearly indicates that Congress intended this rule to have retroactive effect.  <u>See</u> 8 U.S.C. § 1229b(d)(1); <u>St. Cyr</u>, 533 U.S. at 316–18, 121 S. Ct. at 2288–89.  Indeed, there is no temporal language of any kind in the stop-time rule.  This dearth of congressional expression on the topic weighs heavily against finding that Congress clearly intended the rule to have retroactive effect.

We find it significant that several other provisions of IIRIRA <u>do</u> include express language mandating their retroactive application.  For example, IIRIRA's amendment of the definition of "aggravated felony" states that it applies to "conviction[s] . . . entered before, on, or after" the statute's enactment date.  IIRIRA § 321(b) (codified at 8 U.S.C. § 1101(a)(43)).  There is no such language in the stop-time rule.  When considering the retroactive effect of another provision of the cancellation of removal statute, the Supreme Court told us that "the fact that Congress made some provisions of IIRIRA expressly applicable to prior convictions, but did not do so in regard to § 304(b), is an indication that Congress

11

did not definitively decide the issue of § 304's retroactive application to pre-enactment convictions." St. Cyr, 533 U.S. at 319–20, 121 S. Ct. at 2289–90 (quotation marks omitted).  Just so here.  The absence of language compelling retroactivity in the stop-time rule, coupled with the presence of express language calling for retroactive application of other sections of IIRIRA, precludes us from holding that Congress clearly intended the stop-time rule to have retroactive effect.  As far as we are concerned, this ends our inquiry into the first step of the Landgraf test.  We therefore join several of our sister circuits in holding that the statute lacks a clear indication that Congress intended the stop-time rule to have retroactive effect.  See Jaghoori v. Holder, 772 F.3d 764, 770 (4th Cir. 2014); Guzman v. Att'y Gen. U.S., 770 F.3d 1077, 1084 (3d Cir. 2014); Jeudy, 768 F.3d at 603; Martinez v. INS, 523 F.3d 365, 372 (2d Cir. 2008); Sinotes-Cruz v. Gonzales, 468 F.3d 1190, 1199 (9th Cir. 2006).

But before proceeding to Landgraf step two we respond to the government's arguments that the statute clearly requires retroactive application of the stop-time rule.

### a.  Neither IIRIRA § 309(a) nor § 309(c)(5) mandates retroactivity.

The government first argues that IIRIRA § 309(a)—which sets forth the statute's effective date—expressly gives retroactive effect to all provisions of IIRIRA in removal proceedings commenced after the effective date.  This is just

12

not so. The Supreme Court rejected this argument in St. Cyr, holding that § 309(a) merely promulgates an effective date for the statute, which "does not even arguably suggest that [the statute] has any application to conduct that occurred at an earlier date." 533 U.S. at 317, 121 S. Ct. at 2288–89 (quoting Landgraf, 511 U.S. at 257, 114 S. Ct. at 1493).

The government next argues that IIRIRA § 309(c)(5) requires retroactive application of the stop-time rule. Section 309(c)(5), which sets out the "Transitional Rule with Regard to Suspension of Deportation," addresses the application of the stop-time rule to applications for suspension of deportation that were filed in deportation proceedings commenced before the passage of IIRIRA. See IIRIRA § 309(c)(5); see also Tefel, 180 F.3d at 1289 ("Shortly after the enactment of IIRIRA, the BIA held that the new 'stop-time' rule applied to aliens who had applied for suspension of deportation prior to IIRIRA's enactment."). Section 309(c)(5) provides that the stop-time rule "shall apply to notices to appear issued before, on, or after the date of the enactment of this Act."[3] In Tefel, this Court confirmed that the transitional rule of § 309(c)(5) requires the retroactive

---

[3] The transitional rule's reference to "notices to appear" was a mistake. NTAs did not exist before IIRIRA, so the transitional rule could not have applied to NTAs issued prior to the effective date of the Act. This error was corrected in the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, 111 Stat. 2160 (1997), which, among other things, replaced "notices to appear" with "orders to show cause," the pre-IIRIRA functional equivalent of NTAs. See id. § 203(a)(1).

13

application of the stop-time rule to removal proceedings that were pending at the time IIRIRA took effect. See 180 F.3d at 1302. The government asks that we join the Fifth Circuit in holding that the retroactivity provision of the transitional rule also extends to the permanent rule. See Heaven v. Gonzales, 473 F.3d 167, 175 (5th Cir. 2006) ("[I]t would be incongruous . . . to not apply the same rule to aliens whose proceedings were initiated after the effective date of the IIRIRA." (quotation marks omitted)).[4]

We reject the idea that the retroactivity provision of the transitional rule extends to the permanent stop-time rule. Were we to do so, we would effectively treat the transitional rule as the permanent rule. And we see no authority for treating cases that, like Mr. Rendon's, are indisputably governed by the permanent rule as if they were transitional rule cases. To the contrary, the fact that the transitional rule contains language expressly mandating retroactivity shows that "when Congress wanted the stop-time provision to apply retroactively to a limited category of cases—deportation cases pending when IIRIRA took effect—it said so clearly." Martinez, 523 F.3d at 371 (alteration adopted) (quotation marks omitted).

---

[4] The Ninth Circuit also reached a similar, albeit more limited holding as relates to the transitional rule's effect on the retroactive application of the "90/180-day rule." See Garcia-Ramirez v. Gonzales, 423 F.3d 935, 940–41 (9th Cir. 2005) (per curiam). This rule states that a noncitizen's physical presence in the United States ends if the noncitizen departs from the United States for any period in excess of 90 days or for any periods that, in the aggregate, exceed 180 days. Id. at 938. But in a later case the Ninth Circuit held that this reasoning does not extend to the portion of the stop-time rule that is triggered by criminal offenses. Sinotes-Cruz, 468 F.3d at 1199.

14

As with the inclusion of express retroactive language in other portions of the statute, Congress chose not to include temporal language in the permanent stop-time rule. This weighs heavily against finding that Congress intended the rule to operate retroactively.

Even if we were to accept that the retroactivity provision of the transitional rule could be read as extending to the permanent stop-time rule, it still would not apply to the stop-time rule's criminal-offense trigger. The transitional rule expressly mentions only one of the two triggering events for the stop-time rule: the service of a notice to appear or order to show cause. See IIRIRA § 309(c)(5). Nowhere does it refer to the separate criminal-offense trigger. Thus, by its plain terms the transitional rule mandates only the retroactive application of the portion of the stop-time rule triggered by the initiation of removal proceedings. This limitation does not appear to have been a mere oversight. Congress enacted this portion of IIRIRA in order "to prevent [noncitizens] from satisfying the continuous residence rule by stalling in their pending immigration proceedings." Jeudy, 768 F.3d at 603; see also Sinotes-Cruz, 468 F.3d at 1201 (holding that the transitional rule does not apply to the criminal conduct trigger when the respondent pled guilty to a crime committed prior to the passage of IIRIRA). We understand this reasoning, but it has no application in the context of the criminal offense trigger.

15

Our circuit has not held that the transitional rule applies retroactively to the criminal-offense trigger.[5]  For this reason, in order for the government to prevail on its argument that § 309(c)(5) mandates retroactivity, it would have to show both that: (1) the retroactivity provision transitional rule implicitly extended to the criminal conduct trigger and (2) this retroactivity provision implicitly extended to the permanent rule.  Neither of these concepts are supported by the transitional rule or the permanent stop-time rule.  And in any event this language is certainly not "so clear that it could sustain only one interpretation."  St. Cyr, 533 U.S. at 316–17, 121 S. Ct. at 2288.

### b. The BIA's interpretation of the stop-time rule does not warrant Chevron deference.

The government argues that Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984), requires us to defer to the BIA's interpretation of § 1229b(d)(1) as mandating retroactive application.[6]  But we need not defer to an agency's interpretation of a statute that is ambiguous about whether it applies retroactivity.  "[A] statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously

---

[5] Tefel did not discuss the criminal offense trigger and addressed only a class of immigrants who had been placed in removal proceedings before the enactment of IIRIRA.  See 180 F.3d at 1288.

[6] The BIA has held that the stop-time rule is retroactive in at least three precedential decisions.  See Matter of Jurado-Delgado, 24 I. & N. Dec. 29, 32 (BIA 2006); Matter of Robles-Urea, 24 I. & N. Dec. 22, 27 (BIA 2006); Matter of Perez, 22 I. & N. Dec. 689, 691 (BIA 1999).

16

prospective," so there is "no ambiguity in such a statute for an agency to resolve." St. Cyr, 533 U.S. at 320 n.45, 121 S. Ct. at 2290 n.45; accord Sarmiento Cisneros, 381 F.3d at 1280.  For this statute, we are not called upon to defer to the BIA's interpretation of the retroactive effect of the stop-time rule.

Because we are not persuaded that the text of the INA clearly mandates the retroactive application of the stop-time rule we, proceed to the second step of the Landgraf test to determine whether applying the rule to Mr. Rendon's case would have impermissible retroactive effect.

2.

At the second step of Landgraf we determine whether applying the stop-time rule to Mr. Rendon's pre-IIRIRA conviction would have an impermissible retroactive effect.  We conclude that giving retroactive effect to the stop-time rule in Mr. Rendon's case would attach a new and serious legal consequence to his decision to plead guilty to resisting an officer with violence, so it is impermissible for us to do so.  See Landgraf, 511 U.S. at 269–70, 114 S. Ct. at 1499.

St. Cyr largely resolves this inquiry.  In that case, Enrico St. Cyr pled guilty, prior to the enactment of IIRIRA, to a deportable offense.  St. Cyr, 533 U.S. at 293, 121 S. Ct. at 2275.  Under pre-IIRIRA law, he would have been eligible to apply for a waiver of deportation under INA § 212(c).  Id. at 314–15, 121 S. Ct. at 2287.  Again, however, IIRIRA replaced waiver of deportation with cancellation of

17

removal, and Mr. St. Cyr was not eligible for cancellation of removal because of his guilty plea. Id. at 297, 121 S. Ct. at 2277. The Supreme Court held that denying Mr. St. Cyr the opportunity to receive § 212(c) waiver of deportation "attache[d] a new disability, in respect to transactions or considerations already past" and was thus impermissibly retroactive. Id. at 321–23, 121 S. Ct. at 2290–91 (quotation marks omitted). The Court reasoned that noncitizen defendants who plead guilty to crimes waive constitutional rights, from which the government gains "numerous tangible benefits." Id. at 322, 121 S. Ct. at 2291 (quotation marks omitted). When pleading guilty, noncitizens are generally "acutely aware" of the immigration consequences of their conviction and sentence. Id. And preserving eligibility for immigration relief is "one of the principal benefits sought by [noncitizen] defendants deciding whether to accept a plea offer or instead to proceed to trial." Id. at 323, 121 S. Ct. at 2291. Given that plea agreements are often facilitated by the noncitizens' belief in their continued eligibility for waiver of deportation, the Supreme Court held that "it would surely be contrary to familiar considerations of fair notice, reasonable reliance, and settled expectations to hold that IIRIRA's subsequent restrictions deprive them of any possibility of such relief." Id. at 323–24, 121 S. Ct. at 2292 (citation and quotation marks omitted).

Mr. Rendon's case is similar. When he pled guilty to resisting an officer with violence on July 17, 1995, he would likely have known that his guilty plea

18

would not render him immediately deportable.[7]  And but for the later enactment of

the stop-time rule, that guilty plea also would not have cut off his accumulation of

continuous presence towards eligibility for waiver of deportation under INA

§ 212(c).[8]

Thus, by pleading guilty, Mr. Rendon gave up constitutionally protected

rights with the reasonable expectation that his resulting sentence would not affect

his ability to remain present in this country.  Applying the stop-time rule

retroactively would add a new and unforeseen consequence to his guilty plea by

rendering him ineligible for cancellation of removal.  See Sinotes-Cruz, 468 F.3d

---

[7] When Mr. Rendon pled guilty to these crimes, INA § 241(a)(2)(A)(i)(II) rendered deportable a noncitizen convicted of a CIMT and sentenced to a period of confinement of one year or longer.  See Matter of Fortiz-Zelaya, 21 I. & N. Dec. 1199, 1202 (BIA 1998).  AEDPA expanded the scope of INA § 241(a)(2)(A)(i)(II) to include offenses "for which a sentence of one year or longer may be imposed."  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 435(a), 110 Stat. 1214, 1274 (codified as amended at 8 U.S.C. § 1227(a)(2)(A)(i)(II)) (emphasis added).  Because Mr. Rendon was actually sentenced to less than the one year of actual confinement necessary to trigger deportability, his guilty plea to a CIMT did not render him deportable under the pre-AEDPA statutory scheme.  And while AEDPA expressly made this amendment apply retroactively to noncitizens against whom deportation proceedings were commenced after the Act's passage, id., at the time he pled guilty Mr. Rendon could reasonably have expected that his guilty plea would not render him deportable.

[8] At the time Mr. Rendon pled guilty, the basic eligibility requirements for § 212(c) waiver of deportation were that the noncitizen (1) have accrued seven years of continuous presence in the United States and (2) not have served more than five years imprisonment for one or more aggravated felony offenses.  See Ferguson v. U.S. Att'y Gen., 563 F.3d 1254, 1260 (11th Cir. 2009); Matter of Abdelghany, 26 I. & N. Dec. 254, 257 (BIA 2014).  Mr. Rendon was sentenced to only 364 days in custody, well under the five years required by § 212(c).  So, even after his guilty plea, Mr. Rendon would have been eligible for waiver of deportation once he accumulated the required seven years of continuous presence.

19

at 1201 (applying similar analysis to the criminal-offense trigger of the stop-time rule); Jaghoori, 772 F.3d at 772 ("A retroactive application of the stop-time rule would impose new and unforeseen consequences on Petitioner's decision to relinquish [the right to a criminal trial]."); cf. Guzman, 770 F.3d at 1087 (holding that retroactively applying the stop-time rule was permissible where a petitioner's guilty plea rendered him immediately deportable, since after pleading guilty he preserved only "a hope and speculation" that he would not be served with an NTA before accumulating the required seven-years of presence).[9]

Both St. Cyr and Vartelas v. Holder, 566 U.S. 257, 132 S. Ct. 1479 (2012), tell us that retroactively removing a noncitizen's eligibility for discretionary immigration relief attaches a new disability to past conduct and is therefore impermissible under Landgraf's second step. See Vartelas, 566 U.S. at 273, 132 S. Ct. at 1491 (assuming that respondent "likely relied on then-existing immigration law" in shaping his conduct); St. Cyr, 533 U.S. at 325, 121 S. Ct. at 2293 (holding that because the respondent "almost certainly relied upon [the] likelihood [of receiving § 212(c) relief] in deciding whether to forgo [his] right to a trial, the

_____

[9] As our sister circuits' decisions demonstrate, whether a petitioner's pre-IIRIRA conviction rendered him immediately deportable plays an important role in determining whether retroactive application of the stop-time rule is permissible. See, e.g., Jaghoori, 772 F.3d at 772 (distinguishing Kleynburg v. Holder, 525 Fed. App'x 814 (10th Cir. 2013), and Martinez v. INS, 523 F.3d 365, 373 (2d Cir. 2008)—both of which held that applying the stop-time rule to a pre-IIRIRA conviction did not have an impermissibly retroactive effect—on the ground that "in each of these cases, the pre-IIRIRA crime rendered the alien immediately deportable").

20

elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect"). After all, while cancellation of removal is a discretionary form of relief, "[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation." St. Cyr, 533 U.S. at 325, 121 S. Ct. at 2293. Thus, applying the stop-time rule to Mr. Rendon's pre-IIRIRA guilty plea to render him ineligible for cancellation of removal would be impermissibly retroactive.

The government argues this case is distinguishable from St. Cyr because the stop-time rule is triggered by the commission of a crime, rather than by a conviction resulting from a guilty plea. In the government's view, because people are not understood to commit crimes based on a careful weighing of their immigration consequences, the "quid pro quo" nature of plea bargains at the core of the Supreme Court's reasoning in St. Cyr is not present in this case. But this argument misconstrues the operation of the stop-time rule.

Merely committing a qualifying crime does not trigger the stop-time rule. As our Court explained in Barton, qualifying criminal offenses only trigger the stop-time rule after the noncitizen is convicted of or admits to committing a qualifying crime. 904 F.3d at 1301. Once a conviction or admission of a qualifying crime renders the noncitizen inadmissible, his continuous residence period is then back-dated and deemed to have terminated on the date he committed

21

that offense.  Id. at 1301 & n.3.  Therefore, in this case the triggering event was not Mr. Rendon's commission of the crime, but his entry of a guilty plea in July 1995. The reasoning of St. Cyr applies with full force to his circumstance.

Further, as the government correctly acknowledges, to prevail Mr. Rendon need not show detrimental reliance on the future availability of discretionary relief. Vartelas, 566 U.S. at 273–74, 132 S. Ct. at 1491.  This is because in deciding whether a statute has impermissible retroactive effective effect, the "essential inquiry . . . is whether the new provision attaches new legal consequences to events completed before its enactment."  Id. at 273, 132 S. Ct. at 1491 (quotation marks omitted).  So while the question of whether Mr. Rendon may have relied on his understanding of the immigration consequences of his guilty plea informs our retroactivity analysis, he is not required to make this showing.  The central question remains whether applying the stop-time rule to that plea would add new and unforeseen legal consequences.  For the reasons we have discussed, it clearly would.

Still the government argues that retroactive application of the stop-time rule could not possibly add new legal consequences to past conduct because the rule only affects Mr. Rendon's eligibility for cancellation of removal, a form of relief that was not available before the enactment of IIRIRA.

22

This argument succeeds only by blinding itself to the fact that cancellation of removal merely replaced § 212(c) relief and added additional, more exacting eligibility restrictions. See Jeudy, 768 F.3d at 604. Mr. Rendon was not rendered ineligible for § 212(c) relief when he pled guilty in July 1995. By replacing § 212(c) relief with cancellation of removal, IIRIRA made Mr. Rendon ineligible for discretionary relief. Taken together, these changes add a significant and legal consequence to Mr. Rendon's decision to plead guilty. Applying them retroactively to render Mr. Rendon ineligible for cancellation of removal is not permitted.[10]

## V.

The BIA's holding that Mr. Rendon is not eligible for cancellation of removal based on the stop-time rule gives an impermissible retroactive effect to that rule, and it was error. We therefore **REVERSE** that decision and **REMAND** this matter for further proceedings consistent with this decision.

---

[10] The government requests that, if we do find that the stop-time rule lacks a clear statement of retroactivity, we remand for the BIA to consider Landgraf step two in the first instance. As we previously discussed, retroactivity is a question of law that we review de novo. See Goldsmith, 996 F.2d at 1159. Remand for further analysis from the BIA is therefore unnecessary.

23